1

**BURCH & CRACCHIOLO, P.A.**
702 East Osborn Road
2   Phoenix, Arizona 85014
Telephone (602)234-8762
3   Facsimile (602) 850-9762
hmeyers@bcattorneys.com
4
Howard C. Meyers, SBA #005007
5
Attorneys for Timothy Ray Wright
6

7

8               IN THE UNITED STATES BANKRUPTCY COURT

9                   FOR THE DISTRICT OF ARIZONA

10   In re:                          Chapter 11 Proceedings

11   TIMOTHY RAY WRIGHT,             Case No. 2:09-bk-32244-SSC

12             Debtor.

13

14

15

16

17

18          **DISCLOSURE STATEMENT TO ACCOMPANY THE**
            **DEBTOR'S SECOND PLAN OF REORGANIZATION**

19

20                      **(December 21, 2010)**

21

22

23

24

25

26

## I.    INTRODUCTION

Timothy Ray Wright ("Wright" or the "Debtor") Debtor and Debtor in Possession in the above-captioned and numbered Chapter 11 case has prepared this Disclosure Statement (hereinafter the "Disclosure Statement") to solicit acceptances of his Second Plan of Reorganization (the "Plan") filed with the United States Bankruptcy Court for the District of Arizona. The Plan is attached hereto as Exhibit "A".

### A.    PURPOSE OF THE DISCLOSURE STATEMENT

Debtor is disseminating this Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code to provide holders of claims against and interests in the Debtor with sufficient information to permit them to cast votes to accept or reject the Plan.  The Bankruptcy Court has approved this Disclosure Statement for use in connection with this process and has also established deadlines for the casting of ballots on the Plan and for estimating claims.  These dates are set forth on the Order and Notice sent with this Disclosure Statement.

### B.    VOTING ON PLAN AND ELECTION OF TREATMENT.

The Plan provides that each Claim against, or Interest in, the Debtor will be placed into one of several Classes.  The Plan also specifies the treatment provided for each such Class. The Classes and their treatment are described in the Plan and below, in Section IV. Only holders of Claims or Interests in Classes that are "impaired" under the Plan are entitled to vote on the Plan.

If a holder of a Claim or Interest is entitled to vote, such holder may do so by completing and delivering the accompanying ballot form in the manner and within the time specified in the accompanying notice.  If you are a holder of a Claim or Interest entitled to vote, your vote on the Plan is important.

## C. OVERVIEW OF THE DISCLOSURE STATEMENT.

This Disclosure Statement is designed to afford creditors and holders of equity interests in the Debtor with adequate information to make an informed judgment about the Plan. Creditors and Interest holders are urged to read the Plan in its entirety. In the event of a conflict between the Plan and the Disclosure Statement, the terms of the Plan, and the order of the Bankruptcy Court confirming the Plan, shall control.

The Disclosure Statement provides historical information regarding the Debtor's businesses, assets and liabilities, and the circumstances surrounding the filing of the bankruptcy proceeding. The Disclosure Statement summarizes developments during the course of this Chapter 11 case. The Disclosure Statement summarizes the provisions of the Plan, including the classification and treatment of Claims and Interests. The Disclosure Statement contains financial information regarding the Debtor. The Disclosure Statement identifies the current and intended future business operations of the Debtor. The Disclosure Statement discusses the legal requirements for the confirmation of the Plan. The Disclosure Statement discusses the tax aspects of the Plan. The Disclosure Statement also addresses other material in formation and disclosures relative to the Plan.

## D. DEFINITIONS

Most words or phrases used in this Disclosure Statement have their usual and customary meanings. Words or phrases with initial capital letters have the definitions set forth in the Plan or in the Bankruptcy Code.

## E. MATTERS MERITING SPECIAL ATTENTION.

Creditors and other interested parties are urged to read the entire Disclosure Statement and the Plan. The following matters are considered of special importance:

## DEADLINE FOR SUBMITTING BALLOTS

EXECUTED BALLOTS MUST BE RECEIVED NO LATER THAN 5:00 P.M., MOUNTAIN STANDARD TIME ON THE DUE DATE SET BY THE COURT. SINCE MAIL DELAYS MAY OCCUR, BALLOTS SHOULD BE MAILED OR DELIVERED WELL IN ADVANCE OF THE SPECIFIED DATE. ANY BALLOTS RECEIVED AFTER THE DUE DATE MAY NOT BE INCLUDED IN ANY CALCULATION TO DETERMINE WHETHER CREDITORS HAVE VOTED TO ACCEPT OR REJECT THE PLAN.

## VOTING AND IMPAIRMENT

THE PLAN AND THIS DISCLOSURE STATEMENT IDENTIFY DEBTOR'S JUDGMENT AS TO WHETHER EACH CLASS OF CLAIMS OR INTERESTS IS "IMPAIRED" UNDER THE BANKRUPTCY CODE, BUT THE COURT ULTIMATELY DETERMINES WHETHER A CLASS IS IMPAIRED. THE BANKRUPTCY CODE PROVIDES THAT CLAIMS OR INTERESTS IN A CLASS THAT IS NOT IMPAIRED SHALL BE CONCLUSIVELY DEEMED TO ACCEPT THE PLAN. ACCORDINGLY, IF YOU DISAGREE WITH DEBTOR'S JUDGMENT THAT YOUR CLASS IS NOT IMPAIRED, YOU SHOULD SUBMIT A BALLOT AND SEEK A DETERMINATION BY THE COURT OF YOUR RIGHT TO VOTE ON THE PLAN.

## IMPORTANCE OF VOTE

YOUR VOTE IS IMPORTANT AND MAY DETERMINE WHETHER THE PLAN IS CONFIRMED. YOU ARE URGED TO STUDY THE PLAN CAREFULLY AND TO CONSULT WITH YOUR COUNSEL ABOUT ITS IMPACT UPON YOUR LEGAL RIGHTS BEFORE VOTING.

## HEARING ON CONFIRMATION OF PLAN

THE BANKRUPTCY COURT WILL HOLD A HEARING ON

CONFIRMATION OF THE PLAN COMMENCING AT THE TIME AND PLACE STATED IN THE ACCOMPANYING ORDER AND NOTICE. THE HEARING MAY BE CONTINUED FROM TIME TO TIME THEREAFTER WITHOUT FURTHER NOTICE EXCEPT AS GIVEN IN OPEN COURT.

## CONFIRMATION ORDER NECESSARY FOR PLAN TO BE EFFECTIVE

THE PLAN SHALL NOT BE EFFECTIVE UNLESS THE COURT ENTERS AN ORDER CONFIRMING THE PLAN.

## NO OTHER REPRESENTATIONS AUTHORIZED

NO REPRESENTATIONS CONCERNING DEBTOR OR THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. YOU SHOULD NOT RELY ON ANY ADDITIONAL REPRESENTATIONS OR INDUCEMENTS TO SECURE YOUR VOTE ON THE PLAN.

## ABSENCE OF AUDITED FINANCIAL INFORMATION

THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECTED TO A CERTIFIED AUDIT. SUCH INFORMATION AND OTHER STATEMENTS ARE BASED UPON DEBTOR'S BOOKS AND RECORDS AND THE ESTIMATES AND ASSUMPTIONS STATED. ALL INFORMATION IS ACCURATE TO THE BEST KNOWLEDGE, INFORMATION AND BELIEF OF DEBTOR, ALTHOUGH THE DEBTOR IS UNABLE TO WARRANT THAT NO INACCURACIES EXIST.

## NO OBLIGATION TO SUPPLEMENT

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN. NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION

WITH THE PLAN SHALL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE OF THIS DISCLOSURE STATEMENT AND THE MATERIAL RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED. DEBTOR ASSUMES NO DUTY TO UPDATE OR SUPPLEMENT THE DISCLOSURES CONTAINED HEREIN AND DOES NOT INTEND TO UPDATE OR SUPPLEMENT THE DISCLOSURES.

<u>NO INDEPENDENT VERIFICATION BY COURT</u>

THE COURT HAS NOT VERIFIED THE ACCURACY OF THE INFORMATION, AND THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT MEANS ONLY THAT, IF THE INFORMATION IS ACCURATE, IT IS SUFFICIENT TO PROVIDE AN ADEQUATE BASIS FOR CREDITORS AND INTEREST HOLDERS TO MAKE INFORMED DECISIONS WHETHER TO ACCEPT OR REJECT THE PLAN.

<u>NO SEC APPROVAL</u>

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION PASSED ON THE ACCURACY OR ADEQUACY OF THE STATEMENTS IN IT.

F.    OVERVIEW.

1.    Background to the Reorganization.

a. Debtor's Biographical information.

The Debtor was born on October 23, 1962 , in Juneau, Alaska.  He is 48 years old.  The Debtor graduated  from high school in Okemos, Michigan. In the 1980s, the Debtor attended Michigan State University in Lansing, Michigan,  for

one year where he studied a business and accounting curriculum and Arizona State University in Tempe, Arizona, for 2 ½ years where he studied a finance and accounting curriculum. The Debtor also lived in Europe where he studied Italian.

From 1984 through 1994, the Debtor worked as an account executive for the Wilhelm Advertising Agency based in the firm's Los Angeles, California, office but working on accounts throughout the United States and Europe. Starting in 1986, the Debtor started buying houses with his first such acquisition being located in Hawaii. This part-time activity ultimately led the Debtor into the real estate investment and rental field.

Starting in 1995, the Debtor left the advertising field and relocated to Tempe, Arizona, for family reasons. At this time, he began to segue into real estate investment on a full time basis specializing primarily in single family and small multi-tenant properties in Tempe, Arizona. Because some of his properties were in condominium projects subject to Conditions, Covenants and Restrictions (hereafter "CC&Rs") and Home Owner's Associations (hereafter "HOAs") created under the CC&Rs and horizontal property regimes, the Debtor became knowledgeable about HOAs and served as a board member of certain HOAs to protect his interests as an owner of units subject to the CC&Rs and HOAs. At his peak, the Debtor owned upwards of 200 separate properties but the number rose and fell from time to time. For instance, in 2003 and 2004, the Debtor sold 50 properties. At the time of the Chapter 11 filing, the Debtor owned approximately 160 separate parcels of real property.

### b. Financial Information Concerning the Debtor's Business Operations

Financial information relative to the Debtor's pre-petition business operations for the five (5) calendar years from January 1, 2005, through

December 13, 2009, are essentially encapsulated in the Debtor's Form 1040 U.S. Individual Income Tax Returns, true and correct excerpts of which are annexed hereto as Exhibit "B" and incorporated by this reference which are as follows: Exhibit "B-1" for 2005; Exhibit "B-2" for 2006; Exhibit "B-3" for 2007; Exhibit "B-4" for 2008; and Exhibit "B-5" for 2009 from January 1, 2009, up to and through December 13, 2009[1] (hereafter "Tax Returns"). The excerpts from the Tax Returns are from the Debtor's actual income tax returns as filed with the Internal Revenue Service except that social security numbers and other similar numbers have been redacted to minimize the possibility of identity theft or other misuse. The reason that excerpts are used is that the individual returns themselves are very voluminous and it is not feasible for the returns in their entirety to be annexed as exhibits hereto.[2]

The following is a summary of relevant information contained in the Debtor's Form 1040 U.S. Individual Income Tax Returns for the time periods from 2005 through 2009 described above:

| Year | Rents Received | Mortgage Interest Paid to Lenders | Expenses |
| --- | --- | --- | --- |
| 2005 | 1,856,697 | 991,413 | 881,262 |

[1] Pursuant to Internal Revenue Code § 1398, the Debtor made a short year election. Individual debtors may elect to close their taxable year as of the day before the date bankruptcy commences. This election is available to individuals in Chapter 11 cases such as the Debtor. Accordingly, the Debtor's taxable year for calendar 2009 is divided into two "short" taxable years. The first "short" year is from January 1 through December 13, 2009 (the day immediately prior to the Petition Date). The second "short" year from December 14 (the Petition Date) through December 31, 2009.

[2] By way of illustration, the 2008 Form 1040 of the Debtor is 158 pages long. Annexing copies of all of the Debtor's Form 1040 U.S. Individual Income Tax Returns for the period of 2005 through 2009 would literally require that hundreds of pages be annexed to this Disclosure Statement.

| | | | |
|---|---|---|---|
| **2006** | 2,281,023 | 1,196,927 | 532,554 |
| **2007** | 2,951,958 | 1,763,244 | 555,316 |
| **2008** | 2,853,356 | 2,297,855 | 925,660 |
| **2009** | 2,640,035 | 1,036,034[3] | 1,030,595 |

The following is a summary of the depreciation reflected in the Tax Returns:

| Year | Depreciation Expense |
|---|---|
| **2005** | 502,879 |
| **2006** | 555,525 |
| **2007** | 731,466 |
| **2008** | 908,000 |
| **2009** | 857,780 |

The following is a summary of the adjusted gross income reflected in the Tax Returns:

| Year | Adjusted Gross Income |
|---|---|
| **2005** | 771,125 |
| **2006** | 8,228 |
| **2007** | (77,053) |
| **2008** | (1,167,859) |
| **2009** | (1,224,104) |

The number of properties, the specific properties and the financing relative to the specific properties varied from year to year so one calendar year cannot be directly compared to another calendar year because of these variations.

---

[3] The Debtor went into default on many of his loan obligations in July, 2009. This had the effect of reducing the amount of interest paid reportable with respect to his 2009 income tax return.

- 9 -

### c. Market Conditions Which Precipitated the Chapter 11 Filing

The instant Chapter 11 resulted from a combination of national and local economic conditions. The Debtor's long time investment strategy focused upon the acquisition, ownership and sale of single family residences, condominium units and small multi-family properties. As of the few years immediately prior to the Chapter 11 filing, the geographic focus of the Debtor's investment properties were largely concentrated in and around the areas in close proximity to Arizona State University (ASU) in Tempe, Arizona, a major suburb of Phoenix to take advantage of high demand among persons connected with the ASU community or persons who wanted to live in proximity to Mill Avenue, a major employment and entertainment venue in Downtown Tempe. The Debtor's other areas of geographic focus were (a) Paradise Valley, Arizona, a premier suburb not only of the Phoenix Metropolitan area but also nationally, which had minimum one (1) acre zoning; and (b) Encinitas, California, a beach town in northern San Diego County, California, which has been in the process of gentrification characterized by significant redevelopment and upgrading such as the entry of Whole Foods into the neighborhood in which the Debtor's holdings are located.

To cushion himself from the ups and downs of the real estate cycle, the Debtor also developed a stock market portfolio of significant proportions. This was intended to afford him with liquidity separate and apart from the cash flow of his real estate holdings.

In 2007, a national and local recession took hold of significant consequence. This recession had a profound impact on the Debtor's real estate holdings. For example, historically the Debtor had maintained occupancy factors at 97% or above in most years. As of the time of the filing, the Debtor's occupancy

factor had dropped to approximately between 87% and 88%.

The recession also had an impact on rent levels as well as on occupancy rates. Due to serious job loss in Phoenix, attendance at ASU went down affecting demand for the Tempe properties. Students who were normally prime tenants of the Debtor were either living at home instead of moving near school or doubling up with roommates, thus reducing the demand for units. Other competing landlords cut rents and tenants were more cautious about the level of rent they could afford in an uncertain economic time. The market rentals for the Debtor's units went down.

Historically, the Debtor could count on the relative ease of selling or refinancing single family residences. However, as the recession went on, market prices slid at least on a temporary or situational basis to below the amount of the existing loans on many of the Debtor's properties. This made selling or refinancing extremely problematic.

Adverse economic conditions caused the Debtor's stock market portfolio to seriously decline in value. For example, but without limitation, the Debtor had 228,213 shares of stock in the publicly traded P.F. Changs restaurant chain with a total cost basis of $10,037,852. In 2008, these shares of stock were sold by the Debtor for $4,262,060.00 resulting in a capital loss of -$5,775,792.00 reflected in the Debtor's 2008 Schedule D - Capital Gains and Losses (*See* Exhibit "A-3" annexed hereto). The Debtor experienced other sizeable losses and gradually liquidated his stock market portfolio and devoted the funds to his real estate business.

By the second half of 2009, the Debtor was having serious financial problems which were mirrored by the entirety of the real estate and real estate finance industries. These problems were generated due to the external market

conditions and not the overall business model of the Debtor which had been successful for a period of at least 20 years prior to the extraordinary recession which befell the national and local economies.

The Debtor sought nonbankruptcy workouts with his various lenders, most of whom had granted the Debtor primarily residential deed of trust loans as distinguished from commercial loans. Many of this lenders advised the Debtor that they could not speak with him about a workout unless and until he went into default of the loans. From July, 2009, to the Petition Date, the Debtor strove to avoid bankruptcy but he was unable to achieve the level of workout resolution necessary to avert the necessity of filing. At the time of the Petition Date, the Debtor had many pending deed of trust sales in prospect.

### d. Service as Debtor In Possession

Since the Chapter 11 filing on December 14, 2009, the Debtor has been operating his business and managing his assets as a debtor-in-possession in accordance with 11 U.S.C. §§ 1107 and 1108. Pursuant to 11 U.S.C. § 363(c)(1), the Debtor is engaged in the rental of residential real property in the ordinary course of his long standing business.

### 2. Funding for the Plan and Plan Projections.

The Debtor has total deposits in bank accounts as of November 30, 2010, of $1,242,615.77 in ordinary debtor in possession accounts plus $1,555,605.96 in various sequestered accounts for a total of $2,798,221.73 (discussed *infra*). In addition to using these funds, the Debtor shall continue to operate his business affairs in such a manner as to ensure that the Debtor can adhere to the requirements of the Plan. Funds to be used to make payments under the Plan shall derive from the following sources: (a) operation of the business prior to the Effective Date including the collection of rents on the Debtor's real properties

leased to third-party tenants; (b) the operation of the Debtor's business on and after the Effective Date including the collection of rents on the Debtor's real properties leased to third-party tenants; (c) the sale of real property in the ordinary course of the Debtor's business on and after the Effective Date; (d) the refinancing of real property in the ordinary course of the Debtor's business on and after the Effective Date; and (e) the enforcement of the Debtor's rights as a creditor against debtor tenants and other debtors owing money to the Debtor.

The Debtor in conjunction with David Birdsell, the duly appointed accountant for the estate, has prepared a Five Year Pro-Forma of income, expenses & cash flow commencing January, 2011, which is annexed hereto as Exhibit "C" and incorporated by this reference as if fully set forth herein (hereafter "Pro Forma"). The Pro Forma begins with a five (5) year summary and has notes on page 3 of the five (5) year summary which states predicates and assumptions for the Pro Forma. The amortization is based upon a 40 year amortization. Following the summary, there is an annual pro forma for each of the five (5) successive years organized by creditor which deals with each property. You are urged to carefully review and analyze the Pro-Forma in connection with making your decision to accept or reject the Plan.

### 3.    Treatment of Claims.

The Plan classifies claims in accordance with the provisions of the Bankruptcy Code based upon priority, security and other factors. A true and correct copy of the Debtor's Summary of Schedules is annexed hereto as Exhibit "D" and incorporated by this reference (hereafter "Summary").

The Summary reflects the following assets:

| Real Property | 36,665,900.00 |
| Personal Property | 1,977,840.76 |
| Total | 41,643,740.76 |

The Summary reflects the following liabilities:

| Creditors Holding Secured Claims | 43,255,355.48 |
| Creditors Holding Unsecured Nonpriority Claims | 224,340.04 |
| Total | 43,477,695.52 |

Due to adjustments which were made from the books and records of the Debtor after the Statement of Affairs and Schedules were constructed to reflect the foreclosure of the two (2) MidFirst properties which had a total secured debt of approximately $3,000,000.00, the Pro-Forma is based upon a beginning secured debt of $40,255,355.00.

Significant additional detail on assets and liabilities of the Debtor is contained in the Plan. The Plan should be consulted for this detail which is too voluminous to be repeated herein. The real property valuations reflected in the Schedules and the Plan for properties located in Maricopa County, Arizona, are substantiated by written appraisals prepared in close proximity to the December 14, 2009, Chapter 11 filing date by appraisers licensed by the Arizona State Board of Appraisal. The real property valuations reflected in the Schedules and the Plan for the small pool of properties located in the City of Encinitas, San Diego County, California, are the owner valuations of the Debtor based upon his personal knowledge of that market place based upon many years of buying, selling and leasing properties in the City of Encinitas and his current ownership and leasing of multiple properties within the City of Encinitas. The real property valuations contained in the Plan represent the position of the Debtor as to the

value of the individual real properties based upon said appraisals and owner valuations. Each secured creditor is free to dispute these valuations with appraisal evidence of their own.

The Plan details these classes and their treatments. In addition, while the Debtor does not know of the existence of claims in certain other class categories, the Plan provides for the treatment of these other class categories in the event such claims arise. The following is a brief summary of the Plan and is not intended to substitute for a careful reading of the Plan:

### a. Priority Claims.

In accordance with the requirements for plan confirmation set forth in §1129(a)(9), the Plan provides for the payment in full of all Priority Claims, as follows:

**Class 1.A. Administrative Claims.**

**Class 1.B. Wage Claims.**

**Class 1.C. Benefit Plan Claims.**

**Class 1.D. Deposit Claims.**

Each holder of a Class 1.A., 1.B., 1.C., 1.D., to the extent such Claim is an Allowed Claim, shall receive, on account of such Claim, payment of the Allowed Amount of such Claim, in cash, on the later of (i) the Effective Date, (ii) the date on which the Claim becomes Allowed, or (iii) the date upon which such obligation becomes due in accordance with its terms unless the holder of such claims agrees to other treatment. Cure Payments shall be made on the Effective Date or as soon as reasonably practicable thereafter.

The Plan classifies all administrative claims and expenses allowable under § 503(b) and entitled to priority under § 507(a)(2) as Class 1.A. Administrative claims, as defined in § 503 of the Code and in the Plan, consist of the actual,

necessary costs and expenses of preserving the Estate, including taxes incurred, salaries or commissions for services rendered after the commencement of the case, fees of professionals employed by Debtor, and fees and charges assessed against the Estate under Chapter 123 of Title 28 of the United States Code. Notwithstanding the foregoing, in accordance with the requirements of the Bankruptcy Code, professional fees classified within Class 1.A. shall be paid only pursuant to Court authorization.

Under § 1129(a)(9)(A), administrative claims must be paid in full on the Effective Date in order for a plan to be confirmed. The Plan complies with this requirement: by providing that Class 1.A. claims will be paid in full on the Effective Date of the Plan, or upon allowance, whichever occurs first, except to the extent a holder of an administrative claim otherwise agrees. Amounts due to holders of Class 1.A. Claims will be funded from the Initial Distribution on the Effective Date, or as agreed to by the Debtor and the holder of the administrative claim.

Administrative expenses have accrued and will continue to accrue during these proceedings and will be payable on the Effective Date of the Plan. The Bankruptcy Code requires that fees and expenses of attorneys and other professionals are subject to Court approval under § 330 of the Bankruptcy Code. Accordingly, the Plan provides that the fees of such professionals shall not be paid until Final Orders of the Bankruptcy Court have been entered approving and authorizing payment of such fees. Debtor anticipates that these fees will include the fees of Debtor's counsel, Debtor's accountants, special counsel, and ordinary course counsel and other professionals. The Debtor anticipates that the aggregate of such fees and expenses will approximate $300,000.00 but cautions that this is an estimate. Because the Plan provides for payment in full of Class 1.A. Claims as of the Effective Date, the Class 1.A. Claims are not impaired. To

date, Westling & Eldridge, P.C. has been paid fees of $2,214.00 and reimbursed costs of $26.00 for accounting services relative to preparation of the Debtor's 2009 federal and state income tax returns. Burch & Cracchiolo, P.A. made a first interim fee application for service as attorneys for the Debtor in his capacity as Debtor In Possession seeking compensation for professional services rendered in the amount of $99,987.37 and reimbursement of $5,895.00 for actual and necessary expenses advanced by said law firm. The Order Granting Application of Attorneys for Debtor-in-possession for Interim Allowance of Professional Fees and Costs was executed by the Bankruptcy Court on May 30, 2010, and entered on the docket on June 1, 2010 (Dckt. # 450). The awarded fees and costs were paid from the $ 99,961.00 prepetition retainer[4] paid by the Debtor to Burch & Cracchiolo, P.A. on hand as of the date of the entry of said order with the remaining balance of $5,921.37 paid from general funds on hand in the estate of the Debtor. Burch & Cracchiolo, P.A. made a second interim fee application for service as attorneys for the Debtor in his capacity as Debtor In Possession seeking compensation for professional services rendered in the amount of $100,240.00 plus reimbursement for actual and necessary expenses advanced by said law firm. MidFirst Bank filed a limited objection (Docket Item 750) to that portion of the fees that were related to the appeal of the Prepetition Rents Order and an adversary proceeding brought against MidFirst Bank (discussed *infra)*. Pursuant to a Stipulated Order (Docket Item 780), Burch & Cracchiolo, P.A. was awarded interim compensation in the amount of $78,827.37 and $5,895.00 reimbursement for actual and necessary expenses which were paid from general funds on hand in the estate of the Debtor. J.P. Miller & Associates, LLC was

---

[4] The amount of the retainer was $101,000.00 from which the Chapter 11 filing fee of $1,039.00 was deducted.

awarded $6,500.00 for services provided by John P. Miller relating to the preparation of the liquidation analysis which was paid from general funds on hand in the estate of the Debtor pursuant to an Order entered by the Court. (Docket Item 779).

Classes 1.A., 1.B., 1.C., 1.D. are not impaired.

**Class 1.E. Tax Claims.**

Each holder of a Class 1.E. Tax Claim, to the extent that such Claim is an Allowed Claim, shall receive, on account of such Claim (i) payment of the Allowed Amount of such Claim, first through the contribution of funds available from the Initial Distribution on the Effective Date and then in quarterly cash payments, with the first such payment being due on the later of (a) the first (1st) day of the calendar month that is at least ninety (90) days after the Effective Date or (b) ninety (90) days after such Claim is Allowed; and (ii) a final payment of the unpaid balance (to the extent that such a balance exists) of the Allowed Amount of such Claim, plus interest at the Tax Claim Rate, which shall be due on the fifth (5th) anniversary of the Petition Date.

**Class 1.E.** Claims are treated in accordance with § 1129(a)(9)(C) of the Bankruptcy Code and are, accordingly, not impaired for purposes of determining voting rights.

**b. Secured Claims.**

***i. Lender Secured Claims.***

Each holder of a class 2.A. through 2.W. Claim to the extent such Claim is an Allowed Secured Claim, shall receive, on account of such Allowed Secured Claim, (a) the lesser of either (1) the loan balance due in accordance with the terms of the prior loan documents and mortgage/deed of trust documents if the loan balance is less than the  fair market value of the subject real property; or (2)

the full amount of its Allowed Secured Claim with reference to the fair market value of the subject real property if the loan balance due in accordance with the terms of the prior loan documents and mortgage/deed of trust documents if the loan balance is greater than the fair market value of the subject real property; or (b) in the event of a valid Section 1111(b) election, deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the Debtor's interest in such subject real property.

Each holder of a class 2.A. through 2.W. Claim to the extent such Claim is an Allowed Secured Claim, shall retain its lien(s) up to the lesser of either (1) the loan balance due in accordance with the terms of the prior loan documents and mortgage/deed of trust documents if the loan balance is less than the fair market value of the subject real property; or (2) the full amount of its Allowed Secured Claim with reference to the fair market value of the subject real property if the loan balance due in accordance with the terms of the prior loan documents and mortgage/deed of trust documents if the loan balance is greater than the fair market value of the subject real property.

Alternatively, each holder of a class 2.A. through 2.W. Claim shall receive treatment in accordance with any Court-approved stipulation between the Debtor and the Claimant including, but without limitation, Bank of America pursuant to the Stipulation for Allowance and Treatment of Secured Claims of Bank of America dated November 16, 2010 (Administrative Docket Item 864) (hereafter "Bank of America Stipulation"). A true and correct copy of the Bank of America Stipulation is annexed hereto as Exhibit "E" and incorporated by this reference. The Bank of America Stipulation resolves 47 separate loans with the Debtor's largest single creditor and does much to advance the reorganization for the benefit of all

creditors and parties in interest. The circumstances of the Bank of America lending situation is distinguishable from the Debtor's other lending situations because of the number of loans, the aggregate dollar amount of the loans and the general loan to value ratios. The loans were made a longer time ago and thus, even after taking into account the decline in the market, all of the properties are believed to have equity save for the Paradise Valley property.

The Bank of America provides for a consolidation of the various invidual credits. Bank of America, as part of the negotiated bargaining, gave the Debtor the benefit of a $125,000 carve out for post petition taxes, maintenance and management expenses. Bank of America also agreed to release provisions. The foregoing is a summary and is not intended t o recapitulate each and every term of the Bank of America Stipulation.

The Debtor shall pay each holder of a Claim in Classes 2.A. through 2.W. the full amount of its Allowed Secured Claim in accordance with the terms of the prior loan documents - those creditors shall retain their liens in accordance with the terms of their security instruments (mortgages/deeds of trust).

The schematic for the payment of each holder of a Claim in Classes 2.A. through 2.W. is as follows:

1. Payments shall be based upon the lesser of either (A) the loan balance due in accordance with the terms of the prior loan documents and mortgage/deed of trust documents if the loan balance is less than the fair market value of the subject real property; or (B) the full amount of its Allowed Secured Claim with reference to the fair market value of the subject real property if the loan balance due in accordance with the terms of the prior loan documents and mortgage/deed of trust documents if the loan balance is greater than the fair market value of the subject real property.

2.     All net Cash Collateral held by the Debtor pursuant to Cash Collateral Orders of the Bankruptcy Court, less any permitted expenses authorized to be paid by Cash Collateral Orders of the Bankruptcy Court and less any amounts necessary to pay the real property tax secured claims of either Class 2.X or 2.Y in accordance with Section 4.2(B) hereof with respect to the discrete real property generating the Cash Collateral, shall be distributed to each holder of a Class 2.A. through 2.W. Claim as of the Effective Date as part of their initial distribution under the Plan, unless such holders of a  Class 2.A. through 2.W. Claim have received prior payment(s) of all or a part of the Cash Collateral in which they have an interest prior to the Effective Date in which event said payment(s) shall constitute a credit against their respective initial distributions under the Plan. All Cash Collateral Orders of the Bankruptcy Court shall terminate as of the Effective Date of the Plan and shall be superseded by the terms of the Plan.

3.     The Debtor shall pay monthly interest only at the rate of 4.75% simple interest per annum for the first one (1) year (months 1 through 12) measured from the Effective Date.

4.     The Debtor shall pay monthly interest at the rate of 5.0% simple interest plus principal reduction based upon a forty (40) year amortization for the next four (4) years (months 13 through 59) measured from the Effective Date.

5.     All Allowed Secured Claims shall become all due and payable at the end of the five (5) years from the Effective Date of the Plan based upon the starting balance of the lesser of either (A) the loan balance due in accordance with the terms of the prior loan documents and mortgage/deed of trust documents if the loan balance is less than the  fair market value of the subject real property; or (B) the full amount of its Allowed Secured Claim with reference to the fair

market value of the subject real property if the loan balance due in accordance with the terms of the prior loan documents and mortgage/deed of trust documents if the loan balance is greater than the fair market value of the subject real property.

6. Taxes and insurance shall also be paid by the Debtor with appropriate loss payee coverage for the holder of each Allowed Secured Claim consistent with the terms of the Plan or in accordance with any Court-approved stipulation between the Debtor and the Claimant including, but without limitation, Bank of America pursuant to the Stipulation for Allowance and Treatment of Secured Claims of Bank of America dated November 16, 2010 (Administrative Docket Item 864) (Exhibit "E" annexed hereto).

Nothing contained herein shall defeat the right of a holder of a Class 2.A. through 2.W. Claim to such Collateral Recovery involving the lifting of the automatic stay as to which it is otherwise entitled pursuant to order of the Bankruptcy Court, including, but not limited to, Classes 2.G(1)-(12) [Secured Claims of Compass Bank] and 2.N(1)-(2) [Secured Claims of MidFirst Bank].

The Class 2.A. through 2.W. Claims are impaired.

*ii. Interest Rate Issues.*

The above-stated interest rates are consistent with the Debtor's cash flows and are deemed feasible by the Debtor. *See* Exhibit "B" hereto (Five Year Pro-Forma Income/Expense & Cash Flow Commencing June 1, 2010). The above-stated interest rates will be binding upon assenting classes of claims in the event that the Plan is confirmed.

As to non-assenting classes of claims, the Debtor may seek confirmation by cram down under § 1129(b) of the Bankruptcy Code. This requires an interest rate which will ensure that the present value of the economic treatment is

equivalent to the secured portion of the creditor's claim. Thus for cram down purposes, a determining factor is the effective interest rate applicable. However, the Bankruptcy Code does not specify how to calculate the appropriate cram down interest rate.

By way of necessary background, § 1129(a)(8) generally requires, with respect to each class of claims or interests, that such class has accepted the plan, or that such class is not impaired under the plan. If, with respect to a class of secured claims, a plan meets all of the requirements for confirmation except those of subsection eight, it may nevertheless be confirmed under § 1129(b)(1) if the plan does not unfairly discriminate and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

With respect to secured claims, "fair and equitable" is defined by § 1129(b)(2)(A) to include three alternative treatments. It provides:

"(A) With respect to a class of secured claims, the plan provides–

(i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims."

This statute thus defines three conditions under which a plan may be confirmed, or "crammed down," over the objections of a secured creditor.

Subsection (b)(2)(A)(i) of § 1129 of the Bankruptcy Code in essence allows the plan proponent to write a new loan for full payment at a market rate of interest secured by the creditor's prepetition collateral. Subsection (b)(2)(A)(ii) permits a plan that sells the creditor's collateral free and clear of the lien, so long as the lien attaches to all net proceeds of the sale but this subsection is not implicated by the instant . Finally, § 1129(b)(2)(A)(iii) allows a plan to alter the rights of the secured creditor if, and only if, the creditor will receive the "indubitable equivalent" of its claim.

If the Debtor is required to utilize the cram down provisions to secure confirmation of the Plan, it is likely that there may be confirmation issues related to the appropriate cram down interest rate. This may impose an element of uncertainty for both the creditors and the Debtor as to whether or not the Plan can or cannot be confirmed and is considered a risk factor for creditors to consider when making their decision to accept or reject the Plan.

The Supreme Court case of Till v. SCS Credit Corp., 541 U.S. 465, 124 S. Ct. 1951, 158 L. Ed. 2d 787 (2004) was supposed to establish an objective standard by which the cram down interest rate could be determined. However, it fails to provide guidance as to important computational elements relating to establishing cram down interest rates. First, Till fails to explain how the so called "risk premium" (which is to added to the base rate of interest) is to be derived. Additionally, the Till decision did not establish a clear precedent. The Supreme Court advocated a formula approach and then diluted that position by suggesting that a market based rate may be more appropriate. 541 U.S. at 477 at fn. 14 ("...when picking a cram down rate in a chapter 11 case, it might make sense to ask what rate an efficient market would produce.").

In Till, to determine the cram down interest rate in a Chapter 13 case, the

plurality held the Bankruptcy Code is ambiguous but clearly permits modification of secured debt, and that administrative factors call for an objective test. The other methods -- coerced loan, presumptive contract rate, and creditor's cost of funds -- are all based on subjective factors, could overcompensate creditors, and are based on general financial circumstances rather than those of the creditor. Moreover, the Court said that if the rate proves too high, this raises questions about the feasibility of the plan. Justice Thomas, who provided the fifth vote, would use the risk-free rate as being consistent with the statute. The dissenters argued for the presumptive contract rate.

Certain of the creditors retained MCA Financial Group, Ltd. of Phoenix, Arizona, to render an opinion as to a reasonable and supportable interest rate and feasibility with regard to the Debtor's First Plan of Reorganization. The First Plan of Reorganization has been superseded by the instant Plan which provides enhancements as to interest rate, amortization and the Creditor's Equity Pool (discussed *infra*). However, in the interest of providing adequate information, a copy of the September 30, 2010, report of MCA Financial Group, Ltd. is annexed hereto as Exhibit "F" (hereafter "MCA Report"). The Debtor disagrees with the analysis contained therein for many reasons. First, the contract rates of interest by and between the Debtor and his various lenders are at significantly lower interest rates than the interest rates espoused by the MCA Reports. Second, workouts of single family and small multifamily residential property loans are being effected almost daily within the range of between two percent (2%) to three and three quarter percent (3.75%). Thirdly, the rates of interest implicated in the MCA Report are not workable and would effect a lesser result for creditors by precipitating an immediate liquidation of properties in a still very weak market as measured by pricing, demand and lack of financing. There is a prospect for

significant recovery over the five year term of the Plan which will result in a much greater quantum of benefits for creditors. Finally, the Debtor disagrees with the MCA Report's characterization of the loans to the Debtor as being in the nature of something other than residential mortgages. The nature and the terms of the loans as expressed on the face of the loans speak for themselves.

As for the feasibility analysis, the Debtor has been a long term successful operator and investor in single family and small multifamily residential property and is effectively managing the portfolio of properties while weathering the worst economic conditions since the Great Depression of the 1930s. Foreclosure and liquidation now will only expand the losses of creditors while a more patient approach will permit the fundamentals of the market to improve and eliminate the prospect for losses. In the meantime, the properties are capable of servicing meaningful debt loads as are reflected by the demonstrable post-petition income derived by the Debtor's Chapter 11 estate (discussed *infra*). The Plan provides a starting interest rate of 4.75% in the first year escalating to a 5.0% interest rate with amortization during second through fifth years of the Plan plus participation for creditor's in the upside by means of the Creditor's Equity Pool in fifty percent (50%) of the entirety of the Debtor's assets.[5] By way of contrast, the exaggerated "ivory tower" interest rates advocated by the MCA Report do not work in the real world and will ultimately only increase and not minimize the losses to creditors.

It is submitted by the Debtor that the acceptance of the Plan with its clearly defined interest rate schematic is preferable to the prospect of possibly protracted litigation over interest rates in a cram down scenario. This is particularly true since Till does not provide definite or certain guidance as to the issue of how the cram

---

[5] Subject only to the exclusion of his limited pool of exempt property.

down interest rate is to be determined. The foregoing represents the views of the Debtor on the interest rate issue and the Debtor asks that you consider these views in making your decision to accept or reject the Plan.

### iii. Deficiency Issues and Their Bearing on Whether the Plan Presents A Superior Outcome to Foreclosure.

One of the issues confronting creditors in making their decision to accept or reject the Plan is for them to consider whether or not the Plan presents a superior outcome to foreclosure. The Plan essentially provides that the principal balances of the first liens will not be adjusted downward if the subject properties have a current fair market value arguably less than the amount of the principal balance. This treatment contemplates a rebound in the fair market value and stream of income of the real properties serving as collateral security for the Debtor's real property lenders.

To the extent that a secured real estate lender weighs the possibility of seeking to foreclose rather than to accept the Plan, the Debtor would submit that it is important for each such secured real estate lender to consider the liquidation analysis provided by the Debtor and the Debtor's consultant John P. Miller (discussed *infra*) as well as to consider that, for reasons which will be explained, most of the secured real estate lending of the Debtor is functionally nonrecourse in the event of foreclosure due to the practical effect and applicability of various anti-deficiency statutes arising under Arizona and California law. This is also material information relative to any creditor's assessment of whether or not the pool of unsecured creditors will be materially increased by a spill over of post-foreclosure deficiency claims if the automatic stay is lifted as to certain properties to permit foreclosure.

With certain limited exceptions, it is anticipated that most of the real

property loans to which the Debtor is a party giving rise to the Class 2.A. through 2.V. Claims are functionally nonrecourse because of the applicability of certain Arizona or California anti-deficiency statutes which bar the recovery of post-foreclosure deficiencies with regard to either (a) certain types of transactions; (b) certain classes of property; and/or ( c) certain types of foreclosure proceedings. Most of the Debtor's real property loans are with respect to single family or duplex properties located in Arizona or California.

The exceptions include, but are not limited to, an October 15, 2007, $1,000,000.00 loan with BBVA Compass Bank as lender secured by nineteen (19) condominium units, a loan on a small office building in Tempe, Arizona, used as the Debtor's business headquarters and loans secured by small multi-unit apartment complexes such as three (3) loans with JP Morgan Chase Bank as lender secured respectively by a five (5) unit apartment complex, a six (6) unit apartment complex and an eight (8) unit apartment complex, all of which complexes are located in Tempe, Arizona. The foregoing discussion is not directed at these exceptions, all of which give rise to potential recourse or deficiency liability in the event of foreclosure.

The Debtor's has certain single family and duplex properties in Arizona which are subject to insulation from recourse liability because of the applicability of the purchase money anti-deficiency provisions of A.R.S. § 33-729 which provides as follows:

"**Purchase money mortgage; limitation on liability**
A. Except as provided in subsection B, if a mortgage is given to secure the payment of the balance of the purchase price, or to secure a loan to pay all or part of the purchase price, of a parcel of real property of two and one-half acres or less which is limited to and utilized for either a single one-family or single two-family dwelling, the lien of judgment in an action to foreclose such mortgage shall not extend to any other property of the judgment debtor, nor may general execution be issued against the judgment debtor to enforce such

judgment, and if the proceeds of the mortgaged real property sold under special execution are insufficient to satisfy the judgment, the judgment may not otherwise be satisfied out of other property of the judgment debtor, notwithstanding any agreement to the contrary.

B. The balance due on a mortgage foreclosure judgment after sale of the mortgaged property shall constitute a lien against other property of the judgment debtor, general execution may be issued thereon, and the judgment may be otherwise satisfied out of other property of the judgment debtor, if the court determines, after sale upon special execution and upon written application and such notice to the judgment debtor as the court may require, that the sale price was less than the amount of the judgment because of diminution in the value of such real property while such property was in the ownership, possession, or control of the judgment debtor because of voluntary waste committed or permitted by the judgment debtor, not to exceed the amount of diminution in value as determined by such court."(Emphasis added).

The purchase money anti-deficiency statute trumps the provisions of A.R.S. § 33-722 which otherwise provide that the holder of a note secured by a mortgage or deed of trust may waive its security interest in the property and sue directly on the note. *See* Universal Inv. Co. v. Sahara Motor Inn, Inc., 127 Ariz. 213, 619 P.2d 485 (App.1980) (trustee may elect to treat deed of trust as mortgage and then may elect remedy pursuant to A.R.S. § 33-722); Resolution Trust Corp. v. Freeway Land Investors, 798 F.Supp. 593 (D.Ariz.1992).

In Baker v. Gardner, 160 Ariz. 98, 770 P.2d 766 (Ariz. 1988), the Arizona Supreme Court held that the mortgage and deed of trust anti-deficiency statutes, which were enacted after A.R.S. § 33-722, limit a creditor's right to waive its security. The court ruled in Baker that a lender may not waive its security and sue directly on the note when Arizona's anti-deficiency statutes preclude a deficiency judgment. 160 Ariz. at 104, 770 P.2d at 772.

The fact that the Debtor operated on a large scale does not affect the applicability of the anti-deficiency statutes under the instant circumstances for it is the character of the trust property and not the character of the owner of the trust

property which is controlling. While the anti-deficiency statutes have been held not to apply to houses owned by developer that had never had been used as dwellings and were not yet susceptible as being used as dwellings in <u>Mid Kansas Federal Sav. and Loan Ass'n of Wichita v. Dynamic Development Corp.</u>, 167 Ariz. 122, 804 P.2d 1310 (1991), here most of the properties are within the antideficiency definition of properties "limited to" and "utilized for" single family or two-family dwellings. Thus, a deficiency is impermissible because of the undeniable character of most of the properties. <u>Tanque Verde Anesthesiologists L.T.D. Profit Sharing Plan v. Proffer Group, Inc.</u>172 Ariz. 311, 836 P.2d 1021 (App. Div.2 1992), *review denied* ("In this case, however, there is no question that the property comes within the statutes." 836 P.2d at 1023). *Accord:* <u>PNL Credit L.P. v. Southwest Pacific Investments, Inc.</u>, 179 Ariz. 259, 877 P.2d 832, 837 (Ariz.App. Div. 1 1994) [A.R.S. section 33-814(G) (another similarly constructed anti-deficiency statute) focuses on the nature of the "trust property".] Thus, the anti-deficiency statute protects "trust property" that is "limited to and utilized" as "single one-family or single two-family dwellings."

There are a large number of properties owned by the Debtor which have been refinanced and thus are not within the purchase money financing protections afforded by the anti-deficiency provisions of A.R.S. § 33-729. However, because the deed of trust sale is the primary foreclosure mechanism employed by lenders in Arizona to the exclusion of judicial foreclosures due to six (6) month redemption periods and greater complexities which are triggered by judicial foreclosures of deeds of trust in Arizona,[6] there is another key anti-deficiency statute which is of

---

[6] "In Arizona a mortgagor in default may redeem his property within six months following the foreclosure sale. Accordingly, when the beneficiary of a trust deed elects judicial foreclosure, the trustor has the same redemption right as does

likely applicability to the bulk of the single family and duplex properties owned by the Debtor within the State of Arizona. This is the anti-deficiency statutory provisions of § 33-814 which provides thusly:

> "**Action to recover balance after sale or foreclosure on property under trust deed**
>
> A. **Except as provided in subsections F and G of this section**, within ninety days after the date of sale of trust property under a trust deed pursuant to § 33-807, an action may be maintained to recover a deficiency judgment against any person directly, indirectly or contingently liable on the contract for which the trust deed was given as security including any guarantor of or surety for the contract and any partner of a trustor or other obligor which is a partnership....
>
> ...................................................
>
> G. **If trust property of two and one-half acres or less which is limited to and utilized for either a single one-family or a single two-family dwelling is sold pursuant to the trustee's power of sale, no action may be maintained** to recover any difference between the amount obtained by sale and the amount of the indebtedness and any interest, costs and expenses." (Emphasis added).

Given the applicability of these two Arizona anti-deficiency statutes, it is submitted that most, though not all, of the Debtor's Arizona property loans are rendered functionally nonrecourse in nature. This greatly reduces the potential for deficiency claims to be generated even as to any qualifying single family or duplex properties with reference to which the automatic stay of 11 U.S.C. § 362(a) has been lifted.

---

the mortgagor. If the beneficiary elects to foreclose through the trustee's sale, on the other hand, the trustor has no right of redemption after the sale." Chaparral Development v. RMED Intern., Inc., 170 Ariz. 309, 823 P.2d 1317, 1320-1321 (Ariz.App. Div. 1 1991) quoting Lawyer, The Deed of Trust: Arizona's Alternative to the Real Property Mortgagor, 15 ARIZ LAW REV 194 (1973).

1    The Debtor has a relatively small number of mostly single family residences

2    located in Encinitas, California, in Northern San Diego County. The loans on these

3    properties are subject to the applicability of certain California anti-deficiency

4    statutes which, while not identical, are similar in their operative effect to the above-

5    described Arizona anti-deficiency statutes. As one California bankruptcy court has

6

7    noted:

8        "Under California law....a foreclosing creditor rarely has a right to a
         deficiency. This arises from several statutory provisions, the most
9        important of which is that a lien creditor that proceeds by non-judicial
         foreclosure (which is almost universal) waive any right to a
10       deficiency. See Cal.Civ.Code §§ 2924- 2924 (West 2001);  see
         generally 4 HARRY D. MILLER & MARVIN B. STARR, MILLER AND
11       STARR CALIFORNIA REAL ESTATE § 10:214 (3d ed.2000)." In re
         Enewally, 276 B.R. 643, 653 (Bkrtcy.C.D.Cal. 2002).
12

13       Under California law, a creditor that elects to exercise a power of sale under

14   a deed of trust, free of the involved and time-consuming procedures of judicial

15   foreclosure, forgoes any deficiency claim in exchange for the immediacy of private

16   sale and the extinguishment of the debtor's right of redemption. California Code

17   of Civil Procedure section 580a applies to shield a borrower from personal liability.

18   See Roseleaf Corp. v. Chierighino, 59 Cal.2d 35, 27 Cal.Rptr. 873, 378 P.2d 97,

19   102 (Cal.1963). There is no distinction made between purely consumer borrowers

20   versus borrowers like the instant Debtor who are engaged in business. The focus

21   is merely whether or not a non-judicial deed of trust sale is employed to effect the

22   foreclosure.

23       Given the likely applicability of this California anti-deficiency provision, it is

24   submitted that the Debtor's California property loans are also rendered functionally

25   nonrecourse in nature. This greatly reduces the potential for deficiency claims to

26   be generated as to these California properties.

Based upon the foregoing, the Debtor would submit that the instant Plan represents a superior outcome for most secured real property lenders as distinguished from a foreclosure scenario. The Debtor would also suggest that the foregoing anti-deficiency principals will have the effect of reducing the amount of potential unsecured claims arising from post-foreclosure deficiencies.

### ii. *Real Property Tax Secured Claims.*

Class 2.X. consisting of the secured real property tax claims of the Maricopa County, Arizona, Treasurer which are secured by statutory tax liens and Class 2.Y. consisting of the secured real property tax claims of the San Diego County, California, shall be treated as follows:

### ii.    **REAL PROPERTY TAX SECURED CLAIMS.**

Class 2.X. consisting of the secured real property tax claims of the Maricopa County, Arizona, Treasurer which are secured by statutory tax liens and Class 2.Y. consisting of the secured real property tax claims of the San Diego County, California, are unimpaired.

The Debtor has brought the real property taxes current for all properties owned by the Debtor as of November 30, 2010, in both Maricopa County, Arizona, and Sand Diego County, Arizona which the Debtor intend to retain under the Plan. Thus, the Debtor is current on all applicable real property taxes and said Class 2.X. and 2.Y. creditors are unimpaired.

### 1.    **Direct Pay Real Property Tax Secured Claims.**

All secured real property tax claims which are paid directly by the Debtor without payments to an escrow or impound account shall be paid as follows:

A.    The installments due for all properties the Debtor is to retain have been paid and are current as of the date of the filing of this Plan.

B.    The Debtor proposes to stay current on the future installments

coming due for all properties the Debtor is to retain, both before and after the Effective Date of the Plan. Said installments Plan shall be paid in accordance with the applicable deadlines provided under Arizona or California law depending where the subject real property is located.

**2.** **Escrow or Impound Account Paid Real Property Tax Secured Claims.**

All real property tax secured claims which are paid indirectly by the Debtor by means of payments to escrow or impound accounts shall be paid as follows:

A. Any post-petition advances for the payment of real property tax secured claims and/or sums necessary for the payment of real property tax secured claims as of the Effective Date will be paid to each holder of a Class 2.A. through 2.W. Claim having such an escrow or impound account as of the Effective Date as part of their initial distribution under the Plan from the net Cash Collateral held by the Debtor pursuant to Cash Collateral Orders of the Bankruptcy Court with respect to the Cash Collateral in which each lender with escrow or impound accounts has an interest with said payments being credited first to any amounts necessary to pay the real property tax secured claims of either Class 2.X or 2.Y in accordance with Section 4.2(B) of the Plan with respect to the discrete real property generating the Cash Collateral, unless such holders of a Class 2.A. through 2.W. Claim have received prior payment(s) of all or a part of the Cash Collateral in which they have an interest prior to the Effective Date in which event said payment(s) shall constitute a credit against the post-petition advances for the payment of real property tax from such escrow or impound accounts; and

B. The tax installments becoming due after the Effective Date

for the five (5) year term of the Plan shall be paid in accordance with the terms of the escrow or impound requirements.

### iii. Ford Motor Credit Secured Claim.

Class 2.X. shall be paid in accordance with the agreed upon terms providing for monthly installment payments as set forth in the retail installment financing agreement and shall be secured by a lien upon the title of the Debtor's 2007 Ford F150 pickup truck until paid in full.

### e. Unsecured Claims Without Priority.

The Plan provides for the following treatment of unsecured, non-priority Claims.

### Class 3.A. General Unsecured Claims.

The equity interest in and to the economic rights associated with all of all of the Debtor's assets, excepting his limited Exempt Assets, shall be divided into two equal fifty percent (50%) pools as of the Effective Date. The first pool (hereafter the "Creditor's Equity Pool") shall be for the benefit of the holders of Class 3.A. Claims in which they will share *pro rata*. The second pool (hereafter the "Debtor's Equity Pool") shall be for the benefit of the Debtor. In essence, the holders of Class 3.A. Claims and the Debtor will be in financial partnership from on and after the Effective Date up to and through the expiration of the five (5) year term of this Plan. The split between the Creditor's Equity Pool and the Debtor's Equity Pool shall be on a fifty - fifty basis with each pool receiving fifty percent (50%) with the proviso, however, that any and all distributions received for and on account of the Debtor's Equity Pool shall be reinvested in the continuing business operations of the Debtor's real estate business in which the Creditor's Equity Pool shall continue to hold its fifty percent (50%) interest. Thus, as the Debtor reinvests any and all distributions received for and on account of the Debtor's Equity Pool

in the continuing business operations of the Debtor's real estate business, the pool interest of the Creditor's Equity Pool in the Debtor's real estate business shall be enhanced.

During the five (5) year term of this Plan, the Creditor's Equity Pool shall be guaranteed cash for distributions which shall be of a value not less than the projected disposable income of the Debtor [as defined in Section 1325(b)(2) of the Bankruptcy Code] received by the Debtor during the five (5) year term of this Plan as required by Section 1129(a)(15)(B) of the Bankruptcy Code. All distributions will be made with due regard for the Debtor's federal and state income tax obligations and will be made after taking into account the funds necessary, if any, to satisfy such federal and state income tax obligations.

The funding of cash to the Creditor's Equity Pool shall be made from excess cash on hand in the Estate as of the Effective Date, from income received by the Estate from continuing business operations of the Debtor's real estate business and from collections, sales and/or refinancing made from or upon the Debtor's non-exempt assets including, but not limited to, any sequestered assets currently held pursuant to orders of the Bankruptcy Court which hereafter are no longer required to be sequestered.

The Creditor's Equity Pool shall be entitled to equalization payments as funds become available as a first and prior obligation of the Estate to compensate the Creditor's Equity Pool in an amount equal to the then outstanding balance of the projected disposable income of the Debtor [as defined in Section 1325(b)(2) of the Bankruptcy Code] received by the Debtor up to the date said funds become available. For example, if the Debtor has received $16,000.00 of disposable income at the time $50,000.00 in funds come into the Estate, the first $16,000.00 would be paid to the Creditor's Equity Pool as and for said equalization payment.

This would leave a balance of $34,000.00 to be split equally between the Creditor's Equity Pool and the Debtor's Equity Pool or $17,000.00 for each pool. Under this illustration, the Creditor's Equity Pool would receive $33,000.00 for distribution to holders of Class 3.A. Claims [the $16,000.00 equalization payment and the $17,000.00 fifty percent (50%) split of the $34,000.00 remainder] and the Debtor's Equity Pool would receive $17,000.00 which the Debtor would be required to reinvest in the continuing business operations of the Debtor's real estate business for the enhancement of not only the Debtor's interest but also for the enhancement of the interest of the Creditor's Equity Pool in the Debtor's real estate business.

Payments shall be made quarterly from the Initial Distribution until the expiration of the five (5) year term of the Plan.

An annual financial report in the form of the monthly operating reports then required by the Office of the United State Trustee for the District of Arizona shall be provided to each holder of Class 3.A. Claims by February 28th of the successive year. By way of illustration, the report for 2011 would be required to be provided by February 28, 2012.

Nine (9) months prior to the fifth anniversary of the Effective Date, the Debtor shall send his written proposal to each holder of Class 3.A. Claims as to how he would monetize the fifty percent (50%) equity interest of the Creditor's Equity Pool as of the expiration of the five (5) year term of the Plan (hereafter "Proposal"). Each holder of Class 3.A. Claims shall be entitled to file a written objection to the Proposal within thirty three (33) days after the date the Debtor mails the Proposal which objection shall state the grounds in particularity (hereafter "Bar Date"). If objections to the Debtor's written proposal are received from more than fifty percent (50%) of the holders of Class 3.A. Claims based upon

both dollar amount and number by the expiration of the Bar Date, the Debtor shall within ten (10) days after the Bar Date, give written notice to all holders of Class 3.A. Claims that there is a dispute with regard to the Proposal (hereafter "Dispute Notice"). Within thirty three (33) days after the date the Debtor mails the Dispute Notice, (a) the holders of Class 3.A. Claims shall collectively vote to appoint a disinterested MAI appraiser to represent the Creditor's Equity Pool ("Creditor's Equity Pool Representative") with said election to be determined based upon a majority of those holders of Class 3.A. Claims participating in the voting based upon both dollar amount and number; and (b) the Debtor shall appoint a disinterested MAI appraiser to represent the Debtor's Equity Pool ("Debtor's Equity Pool Representative") and he shall give written notice of such appointment to the holders of Class 3.A. Claims.

Within forty five (45) days after the date the Debtor mails the Dispute Notice, the Creditor's Equity Pool Representative and Debtor's Equity Pool Representative shall have an initial meet and confer and establish a procedure to resolve the disputes over the Proposal (hereafter "Meet and Confer"). The Creditor's Equity Pool Representative and Debtor's Equity Pool Representative shall determine if the disputes over the Proposal can be resolved within thirty (30) days of the Meet and Confer. If the disputes cannot be resolved, the Creditor's Equity Pool Representative and Debtor's Equity Pool Representative shall mutually select a third disinterested MAI (hereafter "Arbitrator") who shall serve as an arbitrator to resolve the dispute in binding arbitration to be conducted pursuant to the Federal Arbitration Act. The Arbitrator shall have continuing jurisdiction to implement the arbitral decision and both the Creditor's Equity Pool and the Debtor's Equity Pool shall be bound to comply with the arbitral decision and the continuing jurisdiction of the Arbitrator.

The Allowed Claims of holders of Class 3.A. Claims shall be deemed satisfied when they receive the lesser of (a) one hundred percent (100%) of the principal amount as of the Petition Date of the Allowed Amount of their claims; or (b) their *pro rata* distributions from the Creditor's Equity Pool. If there is a surplus in the Creditor's Equity Pool after paying the holders of Class 3.A. Claims one hundred percent (100%) of the principal amount as of the Petition Date of the Allowed Amount of their claims, said surplus shall be transferred to the Debtor's Equity Pool.

While the Debtor knows of no non-dischargeable claims and there are no pending suits seeking to except any claims from discharge, any non-dischargeable claim which otherwise is a Class 3.A. Claim shall receive the same distributions as the other holders of Class 3.A. Claims. During the term of this Plan, any non-dischargeable claim which otherwise is a Class 3.A. Claim shall be subject to the automatic stay of § 362(a) of the Bankruptcy Code and such other and further stay or stays as are applicable under the terms of the Bankruptcy Code and/or the Plan.

Alternatively, each holder of a Class 3.A. Claim shall receive treatment in accordance with a Court-approved stipulation between the Debtor and the Claimant.

Class 3.A. Claims are impaired.

**f. Interests.**

**Class 4.A. Equity Interests.**

The Debtor shall retain his interest in the Debtor's property subject to the terms of this Plan subject to the rights of creditors and the Debtor's compliance with the obligations imposed upon him pursuant to the Plan. Section 1129(b)(2)(B)(ii) as amended by BAPCPA exempts individual debtors such as the

instant Debtor from the Absolute Priority Rule (discussed *infra*). Accordingly, the Debtor is retaining a fifty percent (50%) interest in the equity of his nonexempt property [with the other fifty percent (50%) being earmarked for his creditors as discussed *supra*] notwithstanding the possibility (depending on the performance of the Creditor's Equity Pool during the five (5) year term of the Plan) that unsecured creditors may not be paid in full.

The Plan has been designed to meet the requirements imposed by Section 1129(a)(15)(B). Section 1129(a)(15) provides:

> "(15) In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan–
>
> (A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
>
> (B) **the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor** (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer." (Emphasis added).

Section 2.1.22 of the Plan defines "Disposable Income" to mean the disposable income of the Debtor, after payment of the Debtor's reasonable and necessary living expenses which are fixed at $8,000.00 per month (plus required medical expense deductibles and anything not covered by the Debtor's medical insurance), that is to be received during the five-year period beginning on the date that the first payment is due under the Plan, and, in the case of non-dischargeable claims, that are to be received during the period beginning on the date that the first payment is due under the Plan and ending when the non-dischargeable claims have been paid in full. Notwithstanding the foregoing definition, the Debtor's "projected disposable income" under § 1129(a)(15) shall be calculated by the

Bankruptcy Court through a judicial determination of the expenses that are reasonably necessary for the support of the Debtor. The Debtor shall abide by this judicial determination and the definition of "Disposable Income" as set forth herein shall be adjusted to whatever amount is judicially determined by the Bankruptcy Court if said determination is different than the amount set forth in the definition of "Disposable Income" as originally set forth herein. The Debtor shall contribute his Disposable Income, after payment of the Debtor's reasonable and necessary living expenses calculated by the Bankruptcy Court through a judicial determination of the expenses that are reasonably necessary for the support of the Debtor, that is to be received during the five-year period beginning on the date that the first payment is due under the Plan, and, in the case of non-dischargeable claims, if any, that are to be received during the period beginning on the date that the first payment is due under the Plan and ending when the non-dischargeable claims have been paid in full. The Debtor has no knowledge of any non-dischargeable claims.

Class 4.A. Interests are impaired.

### g. The Distribution Scheme under the Plan. Timing and Amount of Distributions.

The Plan provides that the Debtor shall make an Initial Distribution on the Effective Date to each Class entitled thereto, monthly payments to holders of Lender Secured Claims in Classes 2.A. to 2.V., payments to or for the benefit of the Secured Real Property Tax Classes 2.X and 2.Y as provided for in the Plan, or sooner if authorized in the Reorganization Case, and by an Initial Distribution and Quarterly Distribution from  to Class 3.A General Unsecured Creditors.

### h. The Reserve Fund.

The Debtor shall maintain a reserve fund of $200,000.00 during the term of the Plan. The purpose of the reserve fund is three-fold. First, to deal with the

seasonality in the Debtor's rental income which dips during the Summer months from late May through August (hereafter "Summer Reserves"). The bulk of the Debtor's real property holdings are concentrated in Tempe, Arizona, in proximity to Arizona State University ("ASU") and the tenant base is heavily oriented towards persons associated with ASU. The peaks and valleys of the annual cash flow cycle with respect to these Tempe properties mirrors the ASU school year with the Summer being the weakest part of the rent cycle due to its status as a break time for a large portion of the ASU community. Secondly, to have a fund on hand of $75,000.00 necessary capital and cosmetic improvement projects (i.e to refurbish rental units to increase rental income). Thirdly, to have a fund on hand of $25,000.00 for unanticipated expenses and emergencies (i.e. flooding and/or storm damage).

The following is a summary of the application to be made of the Reserve Fund:

| APPLICATION | AMOUNT |
| --- | --- |
| Summer Reserves | 100,000.00 |
| Capital and Cosmetic Improvements | 75,000.00 |
| Unanticipated Expenses and Emergencies | 25,000.00 |
| Total | $200,000.00 |

### i. Provisions Relating to Plan Funding.

#### i. Funding of the Initial Distribution.

The Debtor shall fund the initial distribution under the Plan from cash on hand and Cash Collateral in the Debtor's Possession.

#### ii. Rental Income Generated During the Term of the Plan.

Under the Plan, the Debtor shall utilize rental income generated from his

real properties to facilitate the ongoing funding of the Plan.

### iii. Refinancing And/or Liquidation of Real Property During the Term of the Plan.

Following the Effective Date, the Debtor shall have the authority to sell or refinance individual real properties subject to the Secured Claims of Classes 2.A. through 2.Y. Upon the occurrence of the five (5) year call provided for at the end of the Plan term, the Secured Claims of Classes 2.A. through 2.V. shall be satisfied from such sales or refinancing of individual real properties. Similarly, such sales or refinancing of individual real properties shall be used to "cash out" and monetize the final payment due to the Creditor's Equity Pool. Subject to the provisions of the Plan, including, but not limited to, the provisions designed to protect the interests of the unsecured creditors who are holders of Class 3.A. General Unsecured Claims participating in the Creditor's Equity Pool, the Debtor shall have the discretion to use the net proceeds from such sales or refinancing of individual real properties in his business, including for the acquisition of additional individual real properties, and also to ensure the availability of funds necessary to pay any then outstanding Allowed Secured, Unsecured, Administrative and Priority Claims.

Post-confirmation, the Debtor shall file a quarterly distribution report setting forth hisr current income and the amount of all payments made under the Plan.

### j. Plan Implementation.

### i. Debtor to Continue Operations.

The Debtor shall continue to operate his business affairs in such a manner as to ensure that the Debtor can adhere to the requirements of the Plan. In addition to funds on hand as of the Effective Date with the Debtor, the funds to be

used to make payments under the Plan shall derive from the following sources: (a) operation of the business prior to the Effective Date including the collection of rents on the Debtor's real properties leased to third-party tenants; (b) the operation of the Debtor's business on and after the Effective Date including the collection of rents on the Debtor's real properties leased to third-party tenants; (c) the sale of real property in the ordinary course of the Debtor's business on and after the Effective Date; (d) the refinancing of real property in the ordinary course of the Debtor's business on and after the Effective Date; and (e) the enforcement of the Debtor's rights as a creditor against debtor tenants and other debtors owing money to the Debtor.

### ii. Assumption of Residential Leases in Which the Debtor Holds the Landlord's Interest

All residential leases in which the Debtor holds the landlord's interest in existence as of the Effective Date shall be deemed assumed unless specifically has taken prior action to reject any such lease prior to the Effective Date. All other executory contracts not assumed on or prior to the Effective Date shall be rejected as of the Effective Date, unless specific written notice of intent to assume is mailed or delivered to the non-Debtor party or parties before the Effective Date. In the event of assumption, all pre-petition defaults, if any, will be cured on the Effective Date, or as soon thereafter as practicable.

### iii. Postpetition Earnings and Other Future Income of Debtor Available for Funding of the Plan and the Non-Applicability of the Absolute Priority Rule to the Instant Individual Chapter 11 Case.

Pursuant to § 1123(a)(8) of the Bankruptcy Code, the Debtor hereby commits his postpetition earnings and other future income during the term of the

Plan as is reasonably necessary for the execution of the Plan. Postpetition earnings and other future income constituting the Debtor's "projected disposable income" under § 1129(a)(15) shall be calculated by the Bankruptcy Court through a judicial determination of the expenses that are reasonably necessary for the support of the Debtor. The Debtor shall abide by this judicial determination and the definition of "Disposable Income" as set forth in the Plan shall be adjusted to whatever amount is judicially determined by the Bankruptcy Court if said determination is different than the amount set forth in the definition of "Disposable Income" as originally set forth herein.

The following is a summary of the Monthly Expenditures of the Debtor excerpted from Schedule J - Current Expenses of Individual Debtors. To the extent that the expenses total more than $8000.00 per month, a certain portion of the expenses (primarily transportation) are reimbursed due to the business nature of the travel or expenses:

## PERSONAL MONTHLY EXPENDITURES OF DEBTOR

| | |
|---|---|
| Rental Payment | 3,500.00 |
| Electricity and heating fuel | 75.00 |
| Water & sewer (included in rent) | 0.00 |
| Telephone | 200.00 |
| Home maintenance (repairs & upkeep) | 100.00 |
| Food | 800.00 |
| Clothing | 400.00 |
| Laundry & dry cleaning | 150.00 |
| Medical & dental expenses | 1,000.00 |
| Transportation (not including car payments) | 1,000.00 |
| Recreation, clubs and entertainment, periodical, etc. | 145.00 |

| | |
|---|---|
| Renter's insurance | 50.00 |
| Health insurance | 400.00 |
| Auto insurance | 169.00 |
| Auto loan | 646.00 |
| TOTAL | 8,635.00 |

The case of In re Roedemeier, 374 B.R. 264 (Bankr. D. Kan. 2007)

holds that the section 707(b) "means test" expense allowances are not incorporated into the calculation of disposable income for individual Chapter 11 debtors. Id. at 272. Instead, a Chapter 11 debtor's "projected disposable income" under section 1129(a)(15) is calculated by the court through "a judicial determination of the expenses that are reasonably necessary for the support of the debtor and his or her dependents."Id. at 272–73. Since the means test applies to the calculation of "projected disposable income" in Chapter 13 cases, this decision creates a difference between the two chapters. Use of the "means test" involves a stricter formula of determining income that in many cases would require the debtor to contribute more income to funding the plan, thus creating an incentive for debtors to file Chapter 11 in order to use the more flexible judicial calculation.

This analysis is consistent with Collier's view, See 7 Collier on

Bankruptcy,¶ 1129.03, at 1129–74.9 ( Alan N. Resnick et al. eds., 15th ed. rev. 2006) and is based on a close reading of the statutory language. Although § 1129(a)(15) of the Bankruptcy Code refers to chapter 13 for its projected disposable income calculation, the cross reference is to § 1325(b)(2), which merely requires expenses to be "reasonably necessary." See 11 U.S.C. § 1325(b)(2) (2006).

§ 1325(b)(2) of the Bankruptcy Code does not incorporate the § 707(b) means test. That test is brought into chapter 13 by § 1325(b)(3) of the Bankruptcy Code which says that the "reasonably necessary" determination in (b)(2) for above-median income debtors shall be based on the means test. *See* 11 U.S.C. § 1325(b)(3) (2006). The argument that the reference in § 1129(a)(15) to § 1325(b)(2) and its discussion of "disposable income" impliedly cross-references paragraph (3) of the section as well is not well taken. *See also* Collier at ¶ 1129.03, at 1129–74.9. As the Roedemeier court reasoned, Congress would have made the cross reference explicit if that were its intention, and the lack of such specification indicates that the means test of § 707(b) of the Bankruptcy Code is inapplicable in a chapter 11. In re Roedemeier, 374 B.R. at 272.

The Roedemeier court's overall analysis in determining that the means test was inappropriate appears sound as it is based overwhelmingly on the wording of the Bankruptcy Code and the BAPCPA. *See* 11 U.S.C. § 1129(1)(15)(B) (2006). Attempting to cross-reference paragraphs in separate sections under the title, like the creditor in Roedemeier urged, requires too much of a leap to be sensible. In re Roedemeier, 374 B.R. at 272. However, BAPCPA was clearly drafted with a purpose, and that purpose was to prevent the abuse of the system that occurred when debtors filed for chapter 11 specifically to avoid the means test. Therefore, the understanding of what expenses are going to be excluded and included under the reasonable judicial determination employed by the Roedemeier court is what will define this new standard. *Id.* Individual business debtors, such as in the Roedemeier case, are entitled to flexibility.

The Debtor would as part of his disclosures note that the BAPCPA

reforms of 2005 [7]had a substantial impact on individual Chapter 11 cases such as that of the Debtor and in fact repealed the applicability of the Absolute Priority Rule to individual Chapter 11 cases. BAPCPA amended Section 1129(b)(2)(B)(ii) to add the following proviso: "except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section." Thus, an individual debtor in the position of the instant Debtor is statutorily entitled to confirm a plan that has been rejected by unsecured creditors if all the other requirements of Section 1129 are statisfied even if the debtor retains property that has been included in his bankruptcy estate under Section 1115. Two courts have specifically determined that, under Section 1129(b)(2)(B)(ii) as amended, individual Chapter 11 debtors are exempt from the absolute priority rule. In re Roedemeier, *supra* at 274-76 (Bankr. D. Kan. 2007); In re Tegeder, 369 B.R. 477, 480 (Bankr. D. Neb. 2007). As stated by the Roedemeier court:

> "Significantly, Chapter 13 does not impose the absolute priority rule on debtors. Taken together, these changes [which make chapter 11 for individual debtors much like chapter 13] indicate Congress intended to extend the exemption from the absolute priority rule to individual Chapter 11 debtors as well. If a class of unsecured creditors who are not to be paid in full under an individual Chapter 11 debtor's plan can bar the debtor from keeping any prepetition property (which will nearly always include the debtor's interest in whatever business the debtor engages in) by rejecting the plan and invoking the absolute priority rule - that is, if the new exception in § 1129(b)(2)(B)(ii) is read narrowly - then it is difficult to see what purpose these other, related amendments can serve." 374 B.R. at 276.

A helpful summary of the changes effected by BAPCPA to individual

---

[7] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23, was enacted on April 20, 2005, and generally applies ro all case filed on or after October 17, 2005.

Chapter 11 cases is contained in <u>In re Johnson</u>, 402 B.R. 851 (Bkrtcy.N.D.Ind. 2009) as follows:

> "The bankruptcy reforms of 2005 changed many things. Some of those changes make an individual debtor's Chapter 11 case look a lot more like Chapter 13. Property of the estate is not limited to the debtor's interests in property as of the date of the petition. 11 U.S.C. § 541. It now includes property the debtor acquires after the commencement of the case and the debtor's post-petition earnings. *Compare*, 11 U.S.C. § 1115 with 11 U.S.C. § 1306. To the extent necessary, the debtor's post-petition earnings and future income must be used to fund a plan. *Compare*, 11 U.S.C. § 1123(a)(8) with 11 U.S.C. § 1322(a)(1). An individual debtor's plan does not need to satisfy the absolute priority rule, 11 U.S.C. 1129(b)(2)(B), and, even though unsecured creditors will not be paid in full, can be confirmed over their objection so long as the plan satisfies the disposable income test of § 1325(b)(2). 11 U.S.C. § 1129(a)(15). Substantial consummation is no longer a bar to the modification of a confirmed plan. 11 U.S.C. § 1127(b). Instead, an individual debtor's plan can be modified any time prior to the completion of payments and modification may be sought, not just by the plan proponent and the reorganized debtor, id., but by the debtor, the trustee, the United States Trustee, or an unsecured creditor. *Compare*, 11 U.S.C. § 1127(e) with 11 U.S.C. § 1329(a). Finally, unless the court orders otherwise, the individual debtor does not receive a discharge upon confirmation but must wait until all payments under the plan have been completed. *Compare*, 11 U.S.C. § 1141(d)(5) with 11 U.S.C. § 1328(a). These similarities have led one commentator to suggest that 'individual Chapter 11 cases can now be characterized as "big Chapter 13" cases....' Robert J. Landry, III, Individual Chapter 11 Reorganizations: Big Problems with the New 'Big' Chapter 13, 29 U. ARK. LITTLE ROCK L.REV. 251, 252 (2006-07)." *Id.* at 852-853.

**THE FOREGOING IS ONLY A SUMMARY OF THE PLAN. CREDITORS ARE URGED TO READ THE PLAN IN FULL AND TO CONSULT WITH THEIR COUNSEL AND/OR FINANCIAL ADVISERS REGARDING THE PLAN'S TERMS AND LEGAL EFFECT. CREDITORS ARE ADVISED THAT, SHOULD THE PLAN BE CONFIRMED, THE PLAN AND THE ORDER CONFIRMING THE PLAN SHALL BE BINDING ON CREDITORS, THE DEBTOR, AND THE REORGANIZED DEBTOR.**

## II.     DEBTOR'S BUSINESS OPERATIONS

### A.     OWNERSHIP AND OPERATION OF PRIMARILY, BUT NOT EXCLUSIVELY, RENTAL PROPERTIES

The Debtor owned approximately 240 units of rental housing, the

overwhelming bulk of which is located in Maricopa County, Arizona as of the Petition Date. Although the Debtor owns some small multi-unit properties, many of the Debtor's properties are single family units or condominium units. Thus, the Debtor owned approximately 160 separate parcels of real property as of the Petition Date, most of which are devoted to residential rental purposes and rented to tenants pursuant to written leases. With the exception of a few isolated instances (i.e. the few small apartment complexes and a multiple unit condominium loan with Compass Bank), most of these loans are documented as "stand alone" residential loans secured by form residential deeds of trust and assignment of rents and not by commercial loan documentation.

The automatic stay has been lifted in connection with thirty (30) units subject to liens in favor of BBVA Compass Bank (Docket Item 742), a duplex subject to a lien in favor of the Dumas Family Trust (Docket Item 721), two (2) properties subject to liens in favor of MidFirst Bank (Docket Item 211). There is a pending contested stay proceeding by and between the Debtor and Washington Federal Savings involving sixteen (16) individual properties subject to liens in favor of Washington Federal Savings.

The Debtor has an interest in an other real property valued at $214,500.00. These interests include 3 unimproved lots: (a) 2 lots in Montana each valued at $27,000.00 which are each owned free and clear; and (b) an interest in another lot outside Colorado Springs, Colorado, valued at $74,000 which is owned free and clear. The Debtor also has a 1/3 partnership interest in an improved property located on Flathead Lake in Montana with an estimated value of $650,000.00, Ron Potthoff of Whitefish Montana is the managing partner and the Debtor owes money to the partnership due to disproportionate advances by the other partners. The estimated current value of his 1/3 interest in the partnership is $86,500.00.

The Debtor intends to sell these interests during the course of the Plan. Currently, the market for these properties is depressed and the Debtor's business judgment is that the disposition of these properties should be deferred until there is a discernible general economic recovery and in particularly a recovery in the market for vacation type property in Montana and Colorado.

The bulk of these properties are currently occupied by tenants pursuant to written lease agreements entered prepetition. As the landlord, the Debtor is required to maintain a leasing, management, accounting, maintenance, property inspection   and administrative apparatus and a 24 hour, 7 days a week emergency repair reporting and monitoring capability to fulfill its obligations due and owing to the tenants and to maintain the subject properties (hereafter "the Management Apparatus"). In the ordinary course of business, the Debtor buys new appliances for use in his properties and later sells these appliances to tenants and third parties as the appliances are replaced or no longer needed.

As the landlord, the Debtor is required to provide necessary repairs as and when required to maintain the habitability and rentability of the properties. If a property is vacant and such repair or maintenance is necessary, this is performed by the Management Apparatus. The maintenance of vacant properties requires landscaping service (which ordinarily in the case of single family rental properties is an obligation of tenants) and water service so that the landscaping can be maintained.  Third party management companies tend to outsource all repair work to higher priced licensed contractors which are changed frequently. The Debtor's Management Apparatus has a longstanding relationship with an independent contractor who charges $20.00 per hour for his services and who provides coverage on a 24 hour, 7 days a week basis. Using this independent contractor in the first instance is a cost reduction measure which has been very effective. If

the repair is beyond the capabilities of the independent contractor, it is then referred (depending on the particular nature of the repair required) to one of five (5) specialty (i.e. HVAC, electrical, etc.) licensed contractors with whom the Management Apparatus has had long term relationships, some of which go back as far as 20 years. These long term relationships are based upon the Management Apparatus's careful monitoring of both the cost effectiveness and the quality of the work of these specialty licensed contractors.

### B. UTILITIES REQUIRED TO BE PROVIDED TO TENANTS OR TO PRESERVE LANDSCAPING

Some, but not all, of the lease agreements with the tenant obligate the Debtor as landlord to furnish the tenants with various types of utility

service. The pricing of these "utilities included" leases takes into account the cost of these utility services so this is functionally a pass through. The Debtor had no prepetition liabilities to its utility providers. When a property with landscaping is vacant, water service must be maintained to the specific property to keep the landscaping alive. Allowing landscaping to die adversely impacts on the value and rentability of the units.

### C. INSURANCE OF THE INDIVIDUAL PROPERTIES

The Debtor maintains discrete policies of property insurance with lender loss payee coverage for each of its real property. It also maintains general liability coverage, workmens compensation coverage and general liability coverage. Such insurance is essential to protect the interests of each lienholder in the property and the interests of the estate and its creditors.

### D. RENTAL SALES TAXES

The monthly rental stream from each of the properties is subject to the payment of the sales taxes on rents collected. The exact applicable rate varies

by the particular municipality in which the properties are located. This tax is included in the monthly rent for each of the Rental Units so that the sales tax is functionally a pass through (paid by the tenant and then "passed through" to the particular taxing authority). The Debtor is obligated to pay taxes on rents collected pursuant to applicable nonbankruptcy law. This tax is added to the base monthly rent of the units. The Debtor was current on all such sales taxes as of the Petition Date and has remained current post-petition.

## E.    HOMEOWNERS'S ASSOCIATION FEES

Certain of the properties are subject to recorded declarations of HOAs pursuant to either Covenants, Conditions and Restrictions ("CC & R's") or Horizontal Property Regimes ("HPRs"). These CC & R's or HPRs are often prior to the liens of the Secured Creditors and may give the home owners' associations rights superior to the rights of the Secured Creditors whose liens may be subordinate to the liens of the CC&R's or HPRs. The Debtor was current on all obligations due to HOAs prepetition and has stayed current on these obligations post-petition.

## F.    PROPERTY MANAGEMENT

The Management Apparatus requires a staff of five (5) full time employees and one (1) part-time employee and an office of approximately 1200 square feet located at 727 W, University Drive, Tempe, Arizona 85281 in connection with this apparatus as well as one (1) vehicle.

The Management Apparatus is superior to the use of third party management firms in many ways. A first point of superiority is that the employees of the Management Apparatus are highly experienced and very motivated.

A second point of superiority is that the employees of the Management Apparatus can respond to potential tenant inquiries and requests to view the units

in literally minutes instead of several hours or even days. The bulk of the DIP's units are located in Tempe where the Management Apparatus is based so that prospective tenants can literally be given almost instantaneous tours of multiple properties and leasing opportunities can be maximized. Historically, the Management Apparatus has maintained a 97% to 98% occupancy factor. In today's economically depressed environment, the Management Apparatus is still managing to maintain an 87% to 88% occupancy factor despite considerable competition and adverse market conditions which have seen occupancy rates markedly decline.

A third point of superiority is that the Management Apparatus engages in extensive inspection and monitoring of vacant units including at least weekly inspections. This level of vigilance is not available from third party contract managers. A large portion of the DIP's properties are located in the City of Tempe, Arizona, which is particularly stringent about the requirements for the maintenance of vacant dwelling units, thus necessitating the at least weekly inspection and monitoring.

### G.    EVICTION COSTS

Unless defaulting tenants are served with eviction proceedings, defaulting tenants can remain in the Rental properties without paying rent. The commencement and prosecution of eviction proceedings causes tenants to cure their rent defaults or to vacate the premises so that the premises can be relet to performing tenants who pay the agreed upon rental.

The Debtor has been granted authority by order of the Bankruptcy Court to retain Andrew M. Hull, attorney at law, and his Of Counsel attorneys Denise M. Holliday and Kevin W. Holliday as ordinary course professionals. These lawyers are recognized specialists in these matters and very cost effective.

## III.   MAJOR LITIGATION CLAIMS PREDATING THE CHAPTER 11 CASE

### A.   THE INSURANCE LITIGATION CLAIM

The Debtor is the Plaintiff in Maricopa County, Arizona, Superior Court Case No. CV2009-002285 ("Pending Suit") which action was filed on January 23, 2009, and the case is pending therein against Country Mutual Insurance Company, Anthony Waltenburg Insurance Agency, Inc. and its principal, Anthony Waltenburg, arising out of claims for damages and insurance proceeds under Policy No. A02K6384937 for fire damage at the residence located at 9121 N. 69th St., Paradise Valley, Arizona, on or about January 25, 2008 ("the Claims"). The fire caused substantial damage to the residence and its contents. The dispute includes, but is not limited to, the following:

The Debtor's Chapter 11 estate has a claim for $747,942.18 for the cost of restoring the residence to its pre-fire condition. A contractor's estimate of the cost of restoration was $1,259,104.02 (excluding landscaping) and the insurer Country Mutual only paid $511,161.34. The Debtor's Chapter 11 estate claims the difference which is $747,942.18.

The Debtor's Chapter 11 estate has a claim for $92,938.86 for personal property damage and loss. The total personal property submission was $657,640.86 and the insurer Country Mutual only paid $564,702.00. The DIP's estate claims the difference which is $92,938.86.

The Debtor's Chapter 11 estate claims a $15,000 per month additional living expense benefit which Country Mutual stopped paying in November, 2008. As of January, 2010, approximately fourteen (14) months have accrued to date on this portion of the claim totaling $210,000.00 plus $15,000.00 for each additional month to be added for the amount of this claim.

The   Debtor's Chapter 11 estate has a claim for claims adjustment

expenses relating to the costs of retaining a public adjuster. The Debtor's Chapter 11 estate has a claim of $8,500.00 for landscaping expenses. The Debtor's Chapter 11 estate has a claim for pre-judgment interest. The Debtor's Chapter 11 estate has a bad faith claim against the insurer Country Mutual. The Debtor's Chapter 11 estate has a claim for errors and omissions against its captive agent Anthony Waltenburg Insurance Agency, Inc. and its principal, Anthony Waltenburg, arising out of the agent's failure to ensure that adequate coverages were in place for Plaintiff's dwelling, contents and additional living expense at the time of the fire. Other damages are also implicated including emotional distress, punitive damages as to certain claims (bad faith) and the like. There is a breach of contract component to some of the Claims and thus the Debtor's Chapter 11 estate has a claim for attorneys' fees pursuant to either the terms of the insurance contract or state statute.

The law firm of Peshkin & Kotalik, P.C. of Phoenix, Arizona ("the Firm"), has been appointed as special litigation counsel by order of the Bankruptcy Court to represent the Debtor as the estate representative in this litigation. The Fee Agreement provides for a contingent fee of 25% of any recovery prior to 30 days before trial and 33-1/3% of Wright's total recovery (including any award of attorneys' fees) if there is any recovery within 30 days of any trial date, during trial or at the conclusion of trial. The Fee Agreement provides for the Debtor to reimburse the Firm for all costs and expenses related to the prosecution of the Claims. The Firm has advanced and shall continue to advance costs in connection with the Claims and the lawsuit on the Claims hereinafter described. The Fee Agreement has an hourly component in the event that the Debtor is the prevailing party at trial against Country Mutual. In such event, the Firm would apply for attorneys' fees at the rate of $250.00 per hour from Country Mutual and, if

successful, the awarded attorneys' fees would be considered part of the recovery for purposes of calculating the contingent fee. The Firm's compensation for fees would be the larger of either the defined contingent fee or the attorneys' fees awarded by the court in connection with the Claims.

## B.    HYMAS LITIGATION CLAIM

The Debtor was the Plaintiff in Maricopa County, Arizona, Superior Court Case No. CV2006-003485 brought against Nicole Paige Hymas (hereafter "Hymas") as Defendant. The Debtor was represented by Polsinelli Shugart, P.C. of Phoenix, Arizona, in this case. The case involved the claim for partition of what was claimed to be a jointly owned residential real property located in Paradise Valley, Arizona. Hymas was a former girlfriend of the Debtor. There is a dispute about whether or not an enforceable settlement arose which essentially required the Debtor to buy back the subject residential real property. At all times material herein, it was the position of the Debtor that it was entirely within his discretion to decide whether or not to close escrow on the purchase of the property. Pursuant to an order to show cause brought on for hearing by Hymas, the trial court concluded that the settlement obligated the Debtor to purchase the subject real property. On July 30, 2009, the trial court entered an order directing that the Debtor proceed with the settlement subject to securing the financing or funds to complete the settlement. The order also awarded $13,611.00 in attorneys fees. The Debtor appealed the order to Division One of the Arizona Court of Appeals where the appeal was pending as Case No. 1 CA-CV 09- 0610 at the time of the commencement of the Chapter 11 case. The issues on appeal were as follows: (1) Whether any settlement requires the Debtor to actually close escrow on the purchase of the subject property?; (2) Whether the trial court issued an injunction that lacks the form and specificity required by Arizona Rule of Civil Procedure

65(h)?; (3) Whether the trial court abused its discretion in entering a judgement for attorneys' fees against the Debtor for purportedly violating an injunction that lacked the form and specificity required by Arizona Rule of Civil Procedure 65(h)?; and (4) Whether the trial court substituted its judgment for the Debtor's on an issue that, under the settlement, was in his sole discretion? The appeal was stayed by order of the Court of Appeals due to the automatic stay of the Bankruptcy Code. It is obvious that the Debtor no longer has the capability to securing the financing or funds to complete the settlement due to the pendency of this Chapter 11 case. The Debtor has presently elected not to prosecute this appeal to conserve assets of the estate.

During contested proceedings in the Bankruptcy Court, the Debtor and Hymas both filed pleadings concurring that that the relationship between them vis-a-vis the subject real property was one of joint venture. The stay was lifted as the subject real property was held by the joint venture (Docket Item 644). The joint venture needs to be wound up pursuant to applicable Arizona law outside of the Chapter 11 case.

## IV. MAJOR CLAIMS ARISING AFTER OR AS A CONSEQUENCE OF THE CHAPTER 11 CASE

### A.    THE DANZIK TRUST DISPUTE

A luxury residence located 6939 E. Hummingbird, Paradise Valley, Arizona 85253 was formerly owned by the Debtor. The property is subject to a first deed of trust in favor of Bank of America securing a note with a balance due of approximately $4,160,000.00 dated on or about June 12, 2007 (Loan No. 655166628).

The property was subsequently sold on a wraparound basis prepetition to Dennis M. Danzik and Elizabeth J. Danzik, as Trustees of the DEJA II Family

- 58 -

1 Trust (hereafter "Buyers") on or about August 1, 2008. The purchase price was
2 $6,200,000.00 of which $250,000.00 was paid at the close of escrow with the
3 balance represented by a purchase money All Inclusive Note Secured By Deed
4 of Trust dated August 1, 2008, executed by the Buyers as makers in favor of the
5 Debtor as payee in the principal amount of $5,950,000.00 providing for interest at
6 the rate of 6.0% per annum payable in monthly installments of interest only
7 beginning on September 25, 2008, and becoming all due and payable on August
8 25, 2011 (hereafter "Note"). In addition, the Note provides for principal reductions
9 of $83,333.33 each which were due on November 30, 2008, January 31, 2009,
10 and March 31, 2009. The Note provides for default interest at the rate of 12.0%
11 on the unpaid principal from the date of default.

12 Security Title was the designated servicing agent but the Buyers sometimes
13 bypassed the servicing agent. The monthly payments from the Buyers were
14 $29,000.00 per month and were being used to keep the Bank of America loan
15 current which had a monthly installment payment of approximately $19,000.00 per
16 month.

17 The Debtor contends that the Buyers defaulted on their payment obligations
18 by failing to make scheduled payments and noncompliance with their obligations.
19 Post-petition the Buyers defaulted in the monthly payments under the Note. The
20 Debtor directed that a deed of trust sale be commenced by Security Title
21 Company of Phoenix, Arizona which was held on May 6, 2010. The Debtor was
22 the only bidder pursuant to a credit bid. In the aftermath of the completed deed of
23 trust sale, the Buyers have vacated the property.

24 The Buyers have raised various disputes which the Debtor does not believe
25 are valid. First, the Buyers erroneously assert that the principal reductions and the
26 excess portions of the monthly payments had to be used to pay down the senior

loan of Bank of America. There is nothing in the Note or the transactional documentation to support thus. Second, the Buyers assert that they have not been given proper credit for certain payments but the documentation submitted by the Buyers does not substantiate their position.

Due to depressed market conditions, the fair market value of the subject property is currently $3,000,000.00 which is less than the balance due under the Note. The Debtor cannot pursue the Buyer for a post-deed of trust sale deficiency because the Note is a purchase money note secured by a single family residence located on a site of less than 2 and ½ acres and for the further reason that a deed of trust sale was employed to foreclose upon the property.

## B.    CLAIMS ARISING UNDER §§ 544-551OF THE BANKRUPTCY CODE WHICH BEING CONVEYED TO A CREDITORS' TRUST

There has been some question raised by at least one creditor about a repayment of $230,000.00 in July, 2009, by the Debtor to Jolene Hill of Scottsdale, Arizona. The question arises in part because the Debtor took pains to highlight in his Statement of Affairs that Ms. Hill was a former girlfriend. However, it should be noted that the Debtor has known Ms. Hill for 25 years and that she was only his girlfriend for a brief period of that time and that she was not his girlfriend at the time of the unsecured loan transaction giving rise to the debt from the Debtor to Ms. Hill and for which repayment was made. The Debtor does not believe that Ms. Hill had insider status under § 101(31) of the Bankruptcy Code as she was no longer his girlfriend and was merely one of several private lenders the Debtor was dealing with at the time. The Debtor believes that the applicable preference period is 90 days pursuant to § 547(b)(4)(A) of the Bankruptcy Code and that the repayment in question occurred substantially outside of that 90 day period.

However, the Debtor has dealt with this and any similar issue by providing in the Plan for the creation of a Creditor's Trust to which all claims arising under §§ 544-551 of the Bankruptcy Code are being assigned for the benefit of creditors (hereafter "the Assigned Claims"). The Trustee of the Creditors' Trust shall have sole discretion to determine in his or her business judgment which of the Assigned Claims to investigate, which of the Assigned Claims to pursue in litigation and to control such litigation, which of the Assigned Claims to settle, and the terms and conditions of those settlements.

It is submitted that this Creditor's Trust arrangement removes the Debtor from the decision making related to the investigation and determination of what course of action to follow with these claims. This Creditor's Trust arrangement has been carefully thought out by the Debtor to promote the best interests of creditors. The form of Creditor's Trust Agreement is annexed as Exhibit "A" to the Plan (Exhibit "1" hereto).

### C.    MIDFIRST ADVERSARY LITIGATION

The Debtor has brought an adversary proceeding against MidFirst Bank (MidFirst) which is pending as Adversary No. 10-01353 (hereafter "Adversary"). The Debtor contends that the estate is entitled to $29,382.26 in prepetition and post-petition rents attributable to the real property located at 5195 E. Camelback Road, Phoenix, Arizona 85018 (hereafter "Camelback Property") which were not subject to any assignment of rents provisions in the recorded deed of trust and with reference to which there were no separate assignment of rents agreement of record. MidFirst's position is that the matter was resolved by means of a stipulated order with regard to MidFirst Bank's motion to lift stay concerning the Camelback Property and another property in Paradise Valley, Arizona. The Adversary also deals with the turnover of personal property in which the Bank had

no perfected security interest as well as the recovery of other miscellaneous property belonging to the estate (i.e. noncurrent business records of the debtor which were stored at the Camelback Property). The original complaint was amended after MidFirst filed a Motion to Dismiss. MidFirst strenuously rejects the position of the Debtor and has filed a second Motion to Dismiss Amended Adversary Complaint which is now pending in the Adversary.

## V.  POST PETITION OPERATIONS AND DEVELOPMENTS.

### A.  DEVELOPMENTS IN THE CHAPTER 11 CASE.

#### 1.  Continued Operations.

The Chapter 11 case was filed on December 14, 2009. Since the filing, and in consultation with his Court-approved professionals, the Debtor has continued to manage his business affairs post-petition. The Debtor's most recent available Individual Debtor Engaged In Business Monthly Report for the month of November, 2010, is annexed hereto as Exhibit "G" and incorporated by this reference ("Operating Report"). The Operating Report reflects total deposits in debtor in possession bank accounts as of November 30, 2010, of $1,274,935.03 as follows:

| Bank Account | Amount |
| --- | --- |
| Rent Deposit Acct. # 8198 | $ 275,898.66 |
| Operating Acct. # 8180 | $ 389,644.42 |
| Rent Acct. # 8214 | $ 570,072.69 |

Additional separate sequestered accounts have been established pursuant to the March 2, 2010, order of the Bankruptcy Court to hold cash collateral of the various Secured Creditors. These accounts largely mirror but do not exactly

mirror[8] the Cash Collateral Accountings for the Month of November, 2010, which are annexed hereto as Exhibit "H" and incorporated by this reference (hereafter "Cash Collateral Accountings"). The Cash Collateral Accountings reflect the income derived from the Debtor from his various properties.

The Operating Report contains a Profit & Loss Statement for November, 2010, which reflects the following:

| Period | Total Income | Total Expense | Net Income |
|--------|-------------|---------------|------------|
| November, 2010 | 232,293.26[9] | 139,697.73 | 92,595.53 |
| Year to date through November 30, 2010 | 2,296,136.88[10] | 1,874,030.99 | 455.799.82 |

The Operating Report contains a Balance Sheet as of November 30, 2010, which reflects the following asset profile:

| Total Current Assets | 2,798,221.85 |
|----------------------|--------------|
| Fixed Assets Buildings | 37,621,000.00 |
| Land | 128,000.00 |
| Unrealized Decreased Value | 6,982,589.29 |

---

[8] The Debtor's cash collateral stipulation with Bank of America embodied in that certain stipulated order dated February 2, 2010, calls for monthly disbursements of the net cash collateral to Bank of America. The Debtor has turned over all cash collateral in its hands collected up to and through March 31, 2010, to MidFirst Bank pursuant to the order lifting stay and has left the collection of all rents accruing on or after April 1, 2010, from the two properties serving as collateral security to MidFirst Bank to said secured two collateral. MidFirst Bank completed its deed of trust sale with respect to the afore `described collateral security on or about April 20, 2010.

[9] This figure does not include interest income of $142.29 for the month of November, 2010, which is reflected in the Other Income category.

[10] This figure does not reflect interest income of $33,693.33 for the year to date up to and through November 30, 2010, reflected in the Other Income category.

| | |
|---|---|
| **Total Fixed Assets** | 44,731,589.29 |
| **Other Assets** | 129,038.64 |
| **Total Assets** | 47,658,849.78 |

This Balance Sheet as of November 30, 2010, reflects the following profile of the Debtor's liabilities and equity:

| | |
|---|---|
| **TOTAL CURRENT LIABILITIES** | 982,391.29 |
| **TOTAL LONG TERM LIABILITIES** | 43,951,906.57 |
| **EQUITY** | 2,724,551.92 |
| **TOTAL LIABILITIES & EQUITY** | 47,658,849.78 |

2.      Employment of Professionals.

Upon commencing these proceedings, the Debtor applied for approval to employ Burch & Cracchiolo, P.A., of Phoenix, Arizona, as bankruptcy counsel for the Debtor In Possession (Dkt #'s 3 and 12 ). The Bankruptcy Court granted the application by an Order signed on January 4, 2010 (Dkt # 34 ).

The Debtor sought approval for the employment of David Birdsell as the accountant for the Debtor.  (Dkt #'s 6 and 13).   The Bankruptcy Court granted such approval by an Order signed on January 4, 2010 (Dkt # 35).

The Debtor sought approval for the employment of the law offices of Andrew Hull as an ordinary course professional for forcible detainer/eviction services. (Dkt. # 26). The Bankruptcy Court granted such approval by an Order signed on March 25, 2010 (Dkt # 35).

The Debtor sought approval for the employment of Peshkin & Kotalik as special litigation counsel on a contingency basis with respect to state court insurance coverage litigation. (Dkt. # 37). The Bankruptcy Court granted such approval by an Order signed on January 15, 2010 (Dkt # 67).

The Debtor sought approval for the employment of  Westling & Eldridge,

1  P.C. to prepare the Debtor's 2009 federal and state income tax returns. (Dkt. #
2  131). The Bankruptcy Court granted such approval by an Order signed on March
3  2, 2010 (Dkt # 152).

4     The Debtor has also sought approval for the employment of J.P. Miller &
5  Associates, L.L.C., an Arizona limited liability company, to provide the professional
6  services of its principal John P. Miller who has expertise in liquidation analysis and
7  interest rate matters. The application to employ J.P. Miller & Associates, L.L.C.
8  was filed on June 1, 2010, but no order authorizing such employment has been
9  entered as of this date.

10            **3.      Creditors' Meeting and Creditors' Committee.**

11     The United States Trustee ("UST") presided over an initial creditors'
12  meeting under § 341 of the Bankruptcy Code on January 19, 2010. (Dkt # 21).
13  The UST stated that it could not appoint an unsecured creditors committee on
14  January 26, 2010. (Dkt # 82 ).

15            **4.      Cash Collateral Proceedings.**

16     Upon filing, the Debtor sequestered all post-petition rents. The Debtor
17  moved the Court for limited authorization to use cash collateral to maintain the
18  Debtor's business on a going concern basis. (Dkt. # 40). There were objections
19  to the Motion by certain secured creditors (Dkt.#'s 60, 73 and 83).

20     Hearings were held on the cash collateral issues on January 20, 2010,
21  February 16, 2010, and March 24, 2010 (Dkt.#'s 80, 138 and 206). A stipulated
22  form of order authorizing the limited use of cash collateral was signed by the
23  Court on March 2, 2010. (Dkt. # 152). Pursuant to the order, the Debtor
24  provides monthly cash collateral accountings on a creditor by creditor basis and
25  sequesters cash collateral pursuant to the terms of the order. The order has been
26  extended from time to time.

In addition, the secured creditor Bank of America stipulated with the Debtor to the entry of an order granting the Debtor limited authorization to use cash collateral which was signed on February 2, 2010 (Dkt.# 112).

### 5.    Stay Proceedings.

As discussed *supra*, a number of secured creditors have commenced contested proceedings by filing motions which seek to lift the automatic stay. Numerous preliminary hearings have been held. Some of the preliminary hearings in these stay proceedings have been continued due to settlement discussions. The Debtor has commenced making adequate protection payments to Washington Federal Savings equal to the regular monthly payments pending the final hearing in that contested matter. It is anticipated that stay proceedings will be set for final hearings during the course of the Debtor's efforts to obtain plan confirmation.

### 6.    Exclusivity.

Under Section 1121(b) of the Bankruptcy Code, a Debtor has an exclusive right to file a Chapter 11 plan during the first 120 days following the bankruptcy filing.  Debtor has filed its plan and disclosure statement within the exclusivity period.  The Debtor has not sought any additional extension of the exclusivity period.

### 7.    Prepetition Rent Issues

The issue arose as to what interest, if any, did secured creditors have in prepetition rents. The matter was raised by way of a Motion for Determination (1) That Secured Creditors Failed to Take Affirmative Action Prepetition as Required under A.R.S. § 33-702(b) and Thus Failed to Perfect Any Choate Interest in Prepetition Rents; (2) That Secured Creditors Whose Deeds of Trust Have No Assignment of Rents Provisions Have No Interest in Either Prepetition or

Postpetitionrents; and (3) That Strong Arm Powers of Dip Trump Interest of Secured Creditors in Prepetition Rents filed by the Debtor (Dkt.. # 283) (hereafter "Prepetition Rents Motion"). The Prepetition Rents Motion became a contested matter with responses filed by multiple secured creditors. A hearing was held before the Court on the Prepetition Rents Motion on April 29, 2010. On May 14, 2010, an Order Re Prepetition Rents was entered by the Court (Dkt. # 395), a true and correct copy of which is annexed hereto as Exhibit "I" and incorporated by this reference (hereafter "Prepetition Rents Order"). Excepting a limited pool of secured creditors such as Northern Trust, N.A. who did not appear to have an assignment of rents provision in their form of recorded deed of trust nor a separate assignment of rents agreement which was recorded prepetition, the Prepetition Rents Order held that all of the secured creditors with an assignment of rents provision in their deeds of trust or with a separate assignment of rents agreement became perfected in the prepetition rents upon the recordation of those documents in the country recording offices in the counties within Arizona and California in which the Debtor's various real properties are located. (Prepetition Rents Order, ¶¶ 12 and 13). The Prepetition Rent Order provided that concludes that the Debtor may use any rents collected prior to the time he was in default with the secured creditors and that any such rents are not to be construed as prepetition rents subject to the Prepetition Rents Order. (Prepetition Rents Order, ¶ 14). The Debtor generally but not universally went into default on his obligations owed to various secured creditors as of the installment payments due as of July 1, 2009.

The Prepetition Rents Order left open the question of whether or not the strong arm powers of 11 U.S.C. § 544(a)(1)-(3) would cause the Debtor in his capacity as Debtor In Possession to prevail over the secured creditors and found

that the Debtor was required the commencement of an adversary proceeding pursuant to FBR 7001 in order to raise this issue and dismissed the "strong arm" portion of the Motion without prejudice so that it could be raised by the Debtor if he so chooses in a separate adversary proceeding. (Prepetition Rents Order, ¶15).

Pursuant to the Prepetition Rents Order, the Debtor has prepared accountings of net prepetition rents after deducting expenses by lender. The amounts of these prepetition rents are as set forth in the Recap of Debtor In Possession's Accountings of Net Prepetition Rent Collections From July, 2009, Through The Chapter 11 Filing collectively annexed hereto as Exhibit "G" and incorporated by this reference. The total of the net prepetition rent collections from July, 2009, through the Chapter 11 filing was $617,261.83.

The following summarizes the amount of these net prepetition rents as by lender:

| Secured Creditor | Net Prepetition Rents |
|---|---|
| Bank of America | 171,896.24 |
| Bank of Oklahoma | 4,522.88 |
| Chase Bank | 62,764.63 |
| Chase Commercial | 50,515.87 |
| Compass Bank | 45,203.21 |
| Cortez Financial | 0.00 |
| Countrywide Financial | 63,689.20 |
| Merrill Lynch | 25,068.44 |
| MidFirst Bank | 33,826.75 |
| Northern Trust | 0.00 |
| SLS GMC | 5,903.00 |
| Thornburg Mortgage | 45,112.80 |
| Washington Federal | 89,155.85 |

| Wells Fargo | 19,602.71 |
|---|---|
| TOTAL | $617,261.83 |

The Prepetition Rents Order has the effect of reducing the amount of money available for general reorganization purposes.[11] Accordingly, the Debtor has respectfully elected to file a Notice of Appeal with reference to the Prepetition Rents Order on May 28, 2010. The appeal is pending before the Bankruptcy Appellate Panel for the Ninth Circuit. The appeal has been fully briefed. The parties are awaiting the scheduling of oral argument.

Notwithstanding the appeal, the Prepetition Rents Order continues to be a valid and subsisting order with controlling effect in these proceedings unless and until there are further developments, whether in this Court (i.e. the filing and successful prosecution of an adversary proceeding by the Debtor In Possession as to the prepetition rents asserting the strong arm powers of § 544(a) of the Bankruptcy Code and/or as to undersecured loans a preference action pursuant to Section 547 of the Bankruptcy Code which is contemplated) or in a court with proper appellate jurisdiction (i.e. the Ninth Circuit BAP).

The impact of the Prepetition Rents Order can be summarized as follows:

| Description | Amount |
|---|---|
| Net Deposits in Financial Accounts as of 12-15-2009 | $1,850,340.76 |
| Net Prepetition Rents as of the Filing Date (12-14-2009) | ($ 617,261.83) |

---

[11] Notwithstanding the foregoing, the stipulated settlement by and between the Debtor and Bank of America (Docket Item 864) (discussed *supra*) settling 47 loans involves a "dollar splitting" feature in which the Debtor can retain $125,000.00 out of what was then approximately $415,000 of Prepetition Cash Collateral and Postpetition Cash Collateral and includes a settlement of the pending appeal of the Prepetition Rents Order as between the Debtor and Bank of America.

| Total General Funds as of 12-15-2009 | $1,233,078.90 |
|---|---|

## VI. DEBTOR'S CONTINUED OPERATION AND MANAGEMENT OF BUSINESSES AND INVESTMENTS.

Under the Plan, Debtor shall continue to operate and manage the assets within his portfolio of real estate properties. The continued management of these assets shall preserve the Debtor's ability to make the payments called for under the Plan.

## VII. LEGAL REQUIREMENTS FOR CONFIRMATION.

This Section of the Disclosure Statement discusses the legal requirements for Confirmation of the Plan as established by § 1129 and other provisions of the Bankruptcy Code.

### A. VOTING ON PLAN.

The Bankruptcy Code contains detailed provisions regarding which creditors and interest holders are entitled to vote on a plan or reorganization. In general, the creditors and interest holders in classes that are not impaired under the Plan are not entitled to vote and are conclusively presumed to accept a plan. Creditors and interest holders in classes that receive nothing under the plan need not vote and are conclusively presumed to reject a plan. Creditors and interest holders whose claims or interests are "impaired" under the plan are entitled to vote on the plan.

### B. ACCEPTANCE OF PLAN BY CREDITORS.

A Class of Claims impaired under the Plan "accepts" the Plan only if (a) more than one-half of the holders who submit ballots for Claims in that Class vote to accept, and (b) the holders of Claims accepting the Plan hold at least two-thirds, by dollar amount, of the voted Claims within that Class. A Class of

Interests impaired under the Plan "accepts" the Plan only if two-thirds of the voted Interests in such Class have voted to accept the Plan. If the requisite acceptances of each Class of Claims or Interests are obtained and the Plan is confirmed, the Plan will be binding with respect to all holders of Claims and Interests of each Class, including members who did not vote or who voted to reject the Plan.

## C. BEST INTERESTS OF CREDITORS

Section 1129(a)(7) provides that, as a condition to confirmation, a Plan must provide that any creditor or interest holder not voting to accept the Plan must receive, under the Plan, distributions of a value at least equal to that which such creditor would receive if Debtor were liquidated under Chapter 7 of the Bankruptcy Code. This provision is generally referred to as the "best interest test."

The Debtor believes that the best interests test is satisfied by the Plan.[12] For the purpose of applying the "best interest" test, the Debtor has prepared a Liquidation Analysis which is attached as Exhibit "J" to this Disclosure Statement and incorporated by this reference. The Liquidation Analysis indicates that the Debtor's liquidation under Chapter 7 would likely result in considerably less funds reaching the holders of unsecured claims against the Debtor than would occur under the Plan which provides for payment in full to unsecured creditors.

The Debtor has also retained John P. Miller of J.P. Miller & Associates, L.L.C. of Scottsdale, Arizona, an independent consultant, to prepare a liquidation analysis. Mr. Miller's resume is annexed hereto as Exhibit "K" and incorporated by this reference. Mr. Miller is a consultant focusing on current issues in the real

---

[12] Assuming *arguendo* that the best interests test was not instantly met, the Debtor would submit that the post-BAPCPA Sections 1129(a)(15) and 1129(b)(2)(B)(ii) ameliorate the best interests test in individual Chapter 11 cases.

estate market. Mr. Miller was formerly in banking with the following institutions: State Savings Bank, Fifth Third Bank and M&I Bank. As is reflected in his resume, Mr. Miller's employment was continuous with the institutions he worked for being acquired and renamed. He retired as a Senior Vice President of M&I Bank and an executive management member responsible for the management of the commercial real estate department in Arizona and he was also a member of the regional loan committee. Previous positions for Mr. Miller included Commercial Loan Officer, Loan Workout & Asset Management Specialist and Vice President. Mr. Miller negotiated loan workouts with customers, lenders, attorneys and governmental agencies. He also directed the sale and disposition of nonperforming assets, notes and real property. In addition to his banking background, Mr. Miller is a licensed Arizona real estate broker and has had real estate experience with the Phoenix office of Marcus & Millichap, a commercial real estate brokerage concern, and Prudential Management & Realty Services, Inc. Where he was an Acquisitions and Sales Manager.

A two (2) page disclosure of assumptions and definitions entitled "Spread Sheet information" prepared by Mr. Miller (hereafter "the Assumptions") is annexed hereto as Exhibit "L" and incorporated by this reference. It explicates the assumptions used in the four (4) page property by property Spreadsheet entitled "Analysis of Net Sales in Market and Liquidation Scenario" prepared by Mr. Miller which is annexed hereto as Exhibit "M" and incorporated by this reference (hereafter "the Spread Sheet") (hereafter collectively "Miller Analysis"). The Miller Analysis provides a separate Market Value Sales Analysis and a Liquidation Sales Analysis for each of the Debtor's properties. In addition to the foregoing, Mr. Miller prepared an 8 page written report entitled "Analysis of Net Sales: Market Scenario versus Liquidation Scenario" which contains a discussion of the assumptions,

methodology, sources of information and opinions underlying the Miller Analysis is annexed hereto as Exhibit "N" and incorporated by this reference.

The Assumptions state that Market Value is defined as follows:

"...the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto: and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

The Assumptions state that Liquidation Value is defined as follows:

"The most probable price which a specified interest in real property is likely to bring under all of the following conditions:

1. Consummation of a sale will occur within a severely limited future marketing period specified by the client.

2. Actual market conditions are those currently obtaining for the property interest appraised.

3. The buyer is acting prudently and knowledgeably.

4. The seller is under extreme compulsion to sell.

5. The buyer is typically motivated.

6. The buyer is acting in what he or she considers his or her best interests.

7. A limited marketing effort and time will be allowed for the completion of a sale.

8. Payment will be made in cash in U.S. dollars or in terms of financial arrangements comparable thereto.

9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions  granted by anyone associated with the sale."

The source of these definitions are more particularly described in the Assumptions. You are urged to carefully read the Assumptions in their entirety. The Assumptions state as follows:

"Assumptions used in Net Sales in Market value and Liquidation Value

Selling cost used in both scenarios: real estate commissions 4.5%, closing cost title and escrow fees 2%, other cost associated with selling .5% for total selling cost of 7%.

Trustee and court cost for liquidation scenario 3%.

Liquidation discounts;

Tempe properties: 25%
Paradise Valley and Scottsdale properties: 20%
Encinitas California properties 10%
Montana house 25% and Montana lots 35%
Colorado property: 50%"

The conclusions reflected in the Miller Analysis are summarized as follows but you are urged to read the full Miller Analysis together with Exhibits "N" and "O" annexed hereto and incorporated by this reference in order to be fully apprised:

### Analysis of Net Sales in Market Value Sale Scenario

| Market Value | 37,694,567 |
|---|---|
| Selling Costs Market Value Sales Analysis | (2,638,620) |
| Net Sales Market Value Sales Analysis | 35,055,947 |

### Analysis of Net Sales in Liquidation Value Sale Scenario

| Liquidation Discount Liquidation Sales Analysis | (8,362,932) |
|---|---|
| Liquidation Value Liquidation Sales Analysis | 29,331,635 |
| Selling Costs Liquidation Sales Analysis | (2,053,214) |
| Trustee/Court Selling Costs Liquidation Sales Analysis | (879,949) |

- 74 -

| Net Sales Liquidation Sales Analysis | 26,398,472 |
|---|---|

The 8 page Analysis of Net Sales: Market Value versus Liquidation Scenario prepared by Mr. Miller annexed hereto as Exhibit "N" to this Disclosure Statement (hereafter "Underlying Data") provides, among other illuminating information, a description of the assignment, the assumptions upon which the assignment was undertaken, the number of properties and market information including the source of information for each market in which the Debtor owns properties. It is the linchpin of the Miller Analysis and is provided for your information.

Certain data Mr. Miller obtained from the Arizona Regional MLS for Inventory and Sales in the Tempe Zip Code of 85281 and the Paradise Valley Zip Code of 85253 is annexed hereto as Exhibit "O" and incorporated by this reference (hereafter "MLS Data"). The MLS Data was the basis for certain of the information and assumptions contained in the Underlying Data and is an aid to an understanding of the Miller Liquidation Analysis with respect to the Arizona properties which comprise the overwhelming bulk of the properties.

### D. CONFIRMATION POSSIBLE WITHOUT ACCEPTANCE BY CREDITORS.

Debtor intends to request the Bankruptcy Court to confirm the Plan even if a Class of Claims or Interests does not accept the Plan. To do so, the Bankruptcy Court must find that the Plan is fair and equitable with respect to each Class of Claims or Interests that is impaired and has not accepted the Plan. Debtor believes that the Plan will satisfy the fair and equitable requirements of the Bankruptcy Code to the extent such requirements are applicable based upon the vote of Creditors on the Plan.

### 1. Fair and Equitable Treatment of Secured Claims.

With respect to a Class of Secured Claims that does not accept the Plan, the Bankruptcy Code's "fair and equitable" standard includes a requirement that the holders of the Claims either (i) retain their liens on the collateral and receive cash payments, on the Effective Date or in installments, of a value equal to the amount of the Secured Claim, or (ii) receive the realization of the indubitable equivalent of the Secured Claim. Debtor believes that this standard is satisfied by the Plan, which provides that each holder of a Secured Claim will receive payment of the full amount of its Claim on the Effective Date, or in accordance with the terms of its agreement with the Debtor, and the secured creditor will retain the lien on its collateral to secure payment of the amounts specified by the Plan. Assuming *arguendo* that the traditional "fair and equitable" test is not instantly met, the Debtor would submit that the post-BAPCPA Sections 1129(a)(15) and 1129(b)(2)(B)(ii) modify the "fair and equitable" test in individual Chapter 11 cases and that, as modified, the Debtor's Plan meets the "fair and equitable" test.

### 2. Fair and Equitable Treatment of Unsecured Claims.

With respect to an unsecured, non-accepting Class of Claims, the Bankruptcy Code's "fair and equitable" standard includes a requirement that either (i) the holders of the Claims receive cash payments, on the Effective Date or in installments, of a value equal to the amount of the Claim, or (ii) no Class of junior Claims or Interests receives anything on account of such junior Claim or Interest. Debtor believes that this standard is satisfied by the Plan, because all administrative, priority, secured claims and unsecured claims are to be paid in full in accordance with the applicable provisions of the Bankruptcy Code. To the extent that the Debtor will retain his Interests, he does so not only on the basis of payment but also as a result of his contribution of five years of his Disposable

Income as set forth in § 1129(a)(15) and 1129(b)(2)(b)(ii). The Debtor would submit that the post-BAPCPA Sections 1129(a)(15) and 1129(b)(2)(B)(ii) modify the "fair and equitable" test in individual Chapter 11 cases as it applies to unsecured creditors and that, as modified, the Debtor's Plan meets the "fair and equitable" test with regard to all unsecured creditors.

## VIII.   TAX CONSEQUENCES OF PLAN.

The filing of theses Chapter 11 proceedings and/or the consummation of the Plan may have federal and state tax consequences on the Debtor and his creditors. Some of the potential conveyances are summarized below.

Where as here the Debtor is an individual who files for bankruptcy under chapter 11, the bankruptcy estate is treated as a new taxable entity, separate from the individual taxpayer. In this Chapter 11 case, the Debtor remained responsible for the assets of the bankruptcy as a "debtor in possession" and functionally acts as the bankruptcy trustee.

Since the Debtor is in a Chapter 11 bankruptcy and has remain as the debtor in possession, the Debtor must file both a Form 1040 and the Form 1041 for the bankruptcy estate. Because the Debtor is an individual Debtor in a Chapter 11 case, the Debtor was able to elect to close the Debtor's tax year for the year in which the bankruptcy petition is filed, as of the day before the date on which the bankruptcy case commenced (December 13, 2009 in light of the December 14, 2009, filing date). The Debtor's 2009 tax year was divided into 2 short tax years of less than 12 months each.  The first year ends on the day before the commencement date and the second year begins on the commencement date. (January 1 through December 13, 2009, and December 14 through December 31, 2009). Generally, if the election is made, the Debtor's federal income tax liability for the first short tax year becomes an allowable claim against the bankruptcy

estate as a claim arising before the bankruptcy filing. The tax liability for the first short tax year, not subject to discharge under the Bankruptcy Code, can be collected from the estate. However, the Debtor does not have any tax liability for this first short year based upon his draft 2009 Form 1040 (See Exhibit A-5 annexed hereto).

The commencement of this bankruptcy case created an estate, which generally includes all legal or equitable interests in property of the Debtor as of the commencement of the case. There are certain exceptions such as a very limited amount of exempt property. Where as here an individual has filed a bankruptcy petition under Chapter 11, the bankruptcy estate is treated as a separate taxable entity from the Debtor. The debtor in possession is responsible for preparing and filing the estate's tax returns and paying its taxes. The Debtor also remains responsible for filing his or her own returns and paying taxes on income that does not belong to the estate.

Before filing tax returns for the bankruptcy estate, the debtor in possession was required to obtain an employer identification number (EIN) for the estate. The debtor in possession uses the EIN on any tax returns filed for the estate, including estimated tax returns. The Debtor's individual income tax return will not include the income, deductions, or credits that belong to the bankruptcy estate. It will also do not include as income on the Debtor's return any debts canceled because of bankruptcy. However, the bankruptcy estate must reduce certain losses, credits, and the basis in property (to the extent of these items) by the amount of canceled debt.

For cases such as this filed after October 16, 2005, earnings from services performed by an individual Debtor after the commencement of the chapter 11 case are property of the bankruptcy estate under 11 U.S.C. section 1115. Under

IRC section 1398(e)(1), gross income of the estate includes income that the Debtor earns for services performed after the bankruptcy petition date and should be included on the bankruptcy estate's return.

The bankruptcy estate may take deductions or credits in the same way that the Debtor would have deducted or credited them had he or she continued in the same trade, business, or activity. Allowable expenses include administrative expenses, such as attorney fees and court costs.

The bankruptcy estate figures its taxable income the same way as an individual figures taxable income. Bankruptcy law determines which of a Debtor's assets become part of a bankruptcy estate. A transfer (other than by sale or exchange) of an asset from the Debtor to the bankruptcy estate is not treated as a disposition for income tax purposes. Consequently, the transfer does not result in gain or loss, recapture of deductions or credits, or acceleration of income or deductions. For example, the transfer of an installment obligation to the estate would not accelerate gain under the rules for reporting installment sales. The estate is treated the same way the Debtor would be regarding the transferred asset.

When the bankruptcy estate is terminated or dissolved, any resulting transfer (other than by sale or exchange) of the estate's assets back to the Debtor is also not treated as a disposition. The transfer does not result in gain or loss, recapture of deductions or credits, or acceleration of income or deductions to the estate.

The bankruptcy estate must treat its tax attributes the same way that the Debtor would have treated them. These items must be determined as of the first day of the Debtor's tax year in which the bankruptcy case begins. The bankruptcy estate gets the following tax attributes from the Debtor:

1. **NOL carryovers;**

2. **Carryovers of excess charitable contributions;**

3. **Recovery of tax benefit items;**

4. **Credit carryovers;**

5. **Capital loss carryovers;**

6. **Basis, holding period, and character of assets;**

7. **Method of accounting;**

8. **Passive activity loss and credit carryovers,**

9. **Unused at-risk deductions; and**

10. **Other tax attributes as provided in regulations.**

Certain tax attributes of the estate must be reduced by any excluded income from cancellation of debt occurring in a bankruptcy proceeding. When the estate is terminated (for example, when the case ends), the Debtor assumes any remaining tax attributes that were taken over by the estate and generally assumes any of the listed attributes that arise during the administration of the estate.

For bankruptcy cases beginning after November 8, 1992, passive activity carryover losses and credits and unused at-risk deductions as tax attributes that the Debtor pass to the bankruptcy estate and the estate then passes back to the Debtor when the estate terminates. Additionally, transfers to the Debtor (other than by sale or exchange) of interests in passive or at-risk activities are treated as exchanges that are not taxable.

The bankruptcy estate is allowed a deduction for administrative expenses and fees or charges assessed it. These expenses are generally deductible as itemized deductions and are not subject to the 2% floor on miscellaneous itemized deductions. However, administrative expenses attributable to the conduct of a trade or business by the bankruptcy estate or the production of the estate's rents

or royalties are deductible in arriving at adjusted gross income.

If the administrative expenses of the bankruptcy estate are more than its gross income for a tax year, the excess amount may be carried back 3 years and forward 7 years. The amounts can only be carried to a tax year of the estate and never to the Debtor's tax year. The excess amount to be carried back or forward is treated like an NOL and must first be carried back to the earliest year possible.

The Debtor cannot carry back any NOL or credit carryback from a tax year ending after the bankruptcy case has begun to any tax year ending before the case began. If the bankruptcy estate has an NOL that did not pass to the estate from the Debtor under the attribute carryover rules, the estate can carry the loss back not only to its own earlier tax years but also to the Debtor's tax years before the year the bankruptcy case began. The estate may also carry back excess credits, such as the general business credit, to the pre-bankruptcy years.

By following Rev. Proc. 2006-24, 2006-22 I.R.B. 943,the debtor in possession may request a determination of any unpaid tax liability incurred by the bankruptcy estate during the administration of the case by filing a tax return and a request for such a determination with the IRS. For cases filed after October 16, 2005, unless the return is fraudulent or contains a material misrepresentation, the estate, trustee, Debtor, and any successor to the Debtor are discharged from liability for the tax upon payment of the tax:

1.     As determined by the IRS;

2.     As determined by the bankruptcy court, after the completion of the IRS examination; or

3.     As shown on the return, if the IRS does not:

Notify the trustee within 60 days after the request for the

determination that the return has been selected for examination, or Complete the examination and notify the trustee of any tax due within 180 days after the request (or any additional time permitted by the bankruptcy court).

For chapter 11 cases filed after October 16, 2005, a chapter 11 plan can provide for payment of these taxes, with post-confirmation interest, over a period of 5 years from the date of the bankruptcy order for relief (the bankruptcy petition date in voluntary cases), in a manner not less favorable than the most favored non-priority claims (except for convenience claims under section 1122(b) of the Bankruptcy Code). However, the Debtor does not anticipate that there are any such tax claims due and owing.

None of the debt canceled in a bankruptcy case is included in the Debtor's gross income in the year it was canceled. Instead, certain losses, credits, and basis of property must be reduced by the amount of excluded income (but not below zero). However, the focus of the Debtor's Plan is not debt cancellation but rather debt adjustment which will mitigate the requirement to adjust the basis in the property of the Bankruptcy Estate because of debt cancellation. The Plan is a 100% Plan.

However, the general rule is that, if a Debtor excludes canceled debt from income because it is canceled in a bankruptcy case or during insolvency, he must use the excluded amount to reduce certain "tax attributes." Tax attributes include the basis of certain assets and the losses and credits listed later. By reducing the tax attributes, the tax on the canceled debt is partially postponed instead of being entirely forgiven. This prevents an excessive tax benefit from the debt cancellation. Where as here a separate bankruptcy estate has been created, the debtor in possession must reduce the estate's attributes (but not below zero) by the canceled debt.

Generally, the amount of canceled debt is used to reduce the tax attributes in the order listed below. However, the Debtor may choose to use all or a part of the amount of canceled debt to first reduce the basis of depreciable property before reducing the other tax attributes. The order of the reduction of tax attributes is as follows:

Net operating loss. Reduce any NOL for the tax year in which the debt cancellation takes place, and any NOL carryover to that tax year.

General business credit carryovers. Reduce any carryovers, to or from the tax year of the debt cancellation, of amounts used to determine the general business credit.

Minimum tax credit. Reduce any minimum tax credit that is available as of the beginning of the tax year following the tax year of the debt cancellation.

Capital losses. Reduce any net capital loss for the tax year of the debt cancellation, and any capital loss carryover to that year.

Basis. Reduce the basis of the Debtor's property as described under Basis Reduction, later. This reduction applies to the basis of both depreciable and nondepreciable property.

Passive activity loss and credit carryovers. Reduce any passive activity loss or credit carryover from the tax year of the debt cancellation.

Foreign tax credit. Last, reduce any carryover, to or from the tax year of the debt cancellation, of an amount used to determine the foreign tax credit or the Puerto Rico and possession tax credit.

Except for the credit carryovers, the Debtor can reduce the tax attributes listed earlier one dollar for each dollar of canceled debt that is excluded from income. The Debtor can reduce the credit carryovers by 33 cents for each dollar of canceled debt that is excluded from income.

The required reductions in tax attributes are made after figuring the tax for the tax year of the debt cancellation. In reducing NOLs and capital losses, first the Debtor reduces the loss for the tax year of the debt cancellation, and then any loss carryovers to that year in the order of the tax years from which the carryovers arose, starting with the earliest year. The Debtor then makes reductions of credit carryovers in the order in which the carryovers are taken into account for the tax year of the debt cancellation.

In this individual bankruptcy under Chapter 11, the required reduction of tax attributes must be made to the attributes of the bankruptcy estate, a separate taxable entity resulting from the filing of the case. The Debtor as the estate representative must make the choice of whether to reduce the basis of depreciable property first before reducing other tax attributes.

If any amount of the debt cancellation is used to reduce the basis of assets as discussed under, the following rules apply to the extent indicated. Reductions in basis due to debt cancellation are made at the beginning of the tax year following the cancellation. The reduction applies to property held at that time.

The reduction in basis for canceled debt in bankruptcy or in insolvency cannot be more than the total basis of property held immediately after the debt cancellation, minus the total liabilities immediately after the cancellation. This limit does not apply if an election is made to reduce basis before reducing other attributes.

The estate, in the case of an individual bankruptcy under Chapter 11, may choose to reduce the basis of depreciable property before reducing any other tax attributes. However, this reduction of the basis of depreciable property cannot be more than the total basis of depreciable property held at the beginning of the tax year following the tax year of the debt cancellation.

Depreciable property means any property subject to depreciation, but only if a reduction of basis will reduce the amount of depreciation or amortization otherwise allowable for the period immediately following the basis reduction. The Debtor must generally make this choice on the tax return for the tax year of the debt cancellation, and, once made, the Debtor can only revoke it with IRS approval. However, if the Debtor establishes reasonable cause, the Debtor may make the choice with an amended return or claim for refund or credit.

If any basis in property is reduced under these provisions and is later sold or otherwise disposed of at a gain, the part of the gain corresponding to the basis reduction is taxable as ordinary income. The ordinary income part is figured by treating the amount of the basis reduction as a depreciation deduction and by treating any such basis-reduced property that is not already either IRC section 1245 or IRC section 1250 property as IRC section 1245 property. In the case of IRC section 1250 property, the determination of what would have been straight line depreciation is made as though there had been no basis reduction for debt cancellation.

The major points of tax interest on a going forward basis are as follows:

**1.    Rental income** - The rents collected will affect the tax liability. Obviously, vacancy rates and market forces relative to rents achievable within the markets in which the various properties are located will effect the rental income.

**2.    Depreciation** - The depreciation amounts have a significant impact on the taxable income for the Debtor. The basis of many of his properties may be reduced due to the forgiveness or relief of debt.

**3.    Mortgage interest** - The mortgage interest is a major component of the income tax deductions for the Debtor.

4.    **Repairs/Improvements** - With the number of rental units the Debtor owns, repairs and improvements are an annual expense giving rise to income tax deductions for the Debtor depending on the category of the expense.

5.    **NOL carryforward** - There has been a NOL carryforward in the past. The amount is -$1,308,693 per the 2009 income tax return of the Debtor. (*See* Exhibit "A- 5" annexed hereto).

In general, creditors receiving cash under the Plan may recognize an ordinary or capital loss based upon the difference between the amount of their claim and the value of the assets received by them under the Plan. However, the Plan has been devised to minimize or eliminate such losses to creditors.

**IN NO EVENT WILL DEBTOR OR ANY AFFILIATE OF PROFESSIONAL ADVISORS ENGAGED BY ANY OF THEM BE LIABLE IF, FOR ANY REASON, THE FEDERAL TAX CONSEQUENCES OF THE PLAN ARE OTHER THAN AS ANTICIPATED. CREDITORS MUST LOOK SOLELY TO AND RELY SOLELY UPON THEIR OWN ADVISORS AS TO THE FEDERAL TAX CONSEQUENCES OF THIS PLAN.**

**IX.    CLAIMS BAR DATES AND EFFECTIVE DATE.**

**A.    BAR DATES.**

A bar date for the filing of proofs of claim has been set in the Order and Notice of Time Within Which to File Proofs of Claim and for Hearing on Disclosure Statement entered by the Bankruptcy Court.

**B.    PLAN EFFECTIVE DATE.**

"Effective Date" means the date upon which all conditions to the effectiveness of the Plan have been satisfied and the reorganized Debtor take steps necessary to substantially consummate the Plan.

## X.    RECOMMENDATIONS OF THE DEBTOR.

Debtor recommends that the Plan of Reorganization be approved.  Before making this recommendation, Debtor considered, and rejected, the alternative of proposing a Plan based upon one or more of the following different approaches:

**Equity Buyout/Recapitalization of Debtor.**  The Debtor attempted various other solutions including seeking capital for through the sale of equity.   In the extraordinary market conditions currently prevailing, the Debtor was unable to attract investment capital.   An equity buyout or a recapitalization investment to resolve the instant debtor-creditor situation was simply not feasible.

**Total Liquidation.**  Debtor also considered the option of total liquidation under Chapter 7.  Liquidation of the Debtor's interests in various assets, however, held only a low chance for a substantial recovery for the Debtor's creditors.  The liquidation value of these assets is simply not equal to their income stream potential and the prospects for future rebounding in values as the economy improves both locally and nationally. In particular, the Arizona real estate market has a historically demonstrable capacity to rebound.   The liquidation of the Debtor's real estate and business assets does not seem to hold the hope of any significant recovery in the near term due to the terribly depressed market conditions.

Finally, the Debtor has substantial assets and is contributing them to the Plan, in addition with his labor, in such a way that the value received by their creditors will exceed a liquidation of their assets.

Given these parameters, Debtor believes that a structured reorganization holds the best possible solution for creditors.

In light of these alternatives, Debtor believes that the Plan is in the best interest of all creditors and parties in interest.

1    DATED this 21st day of December, 2010.

2                                                  _____
                                                   Timothy Ray Wright, Debtor and Debtor In
3                                                  Possession

4    BURCH & CRACCHIOLO, P.A.

5
     _____
6    Howard C. Meyers, Of Counsel
     702 E. Osborn Road, Suite 200
7    P.O. Box 16882
     Phoenix, AZ 85011
8    Attorneys for Timothy Ray Wright,
     Debtor and Debtor In Possession

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**EXHIBITS TO DISCLOSURE STATEMENT TO ACCOMPANY THE DEBTOR'S SECOND PLAN OF REORGANIZATION**

**(Revised as of December 21, 2010)**

| EXHIBIT NUMBER OR LETTER | DESCRIPTION |
|---|---|
| Exhibit "A" | First Plan of Reorganization |
| Exhibit "B" | Excerpts from Debtor's Form 1040 U.S. Individual Income Tax Returns from 2005 through 2009 |
| Exhibit "C" | Five Year Pro-Forma Income/Expense & Cash Flow Commencing January 1, 2011 |
| Exhibit "D" | Debtor's Summary of Schedules |
| Exhibit "E" | Stipulation for Allowance and Treatment of Secured Claims of Bank of America |
| Exhibit "F" | MCA Report |
| Exhibit "G" | Debtor Engaged in Business Monthly Report for the Month of November, 2010 |
| Exhibit "H" | Cash Collateral Accountings for the Month of November, 2010 |
| Exhibit "I" | Order Re Prepetition Rents Entered May 14, 2010 |
| Exhibit "J" | Debtor's Liquidation Analysis |
| Exhibit "K" | John P. Miller Resume |
| Exhibit "L" | Miller Analysis (Assumptions) |
| Exhibit "M" | Miller Market Value Analysis and Liquidation Sales Analysis for Each Property |
| Exhibit "N" | Miller Analysis of Net Sales: Market Scenario Versus Liquidation Scenario (Discussion of Assumptions, Methodology and Opinions) |
| Exhibit "O" | MSL Data Supporting Miller Liquidation Analysis |